STATE of Minnesota, Respondent,

v.

David Eugene WRIGHT, Appellant.

No. A03–1197.

Supreme Court of Minnesota.

Jan. 25, 2007.

John Stuart, State Public Defender, Leslie J. Rosenberg, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Minnesota State Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, David C.

Brown, Assistant County Attorney, Minneapolis, MN, for Respondent.

Beverly Balos, University of Minnesota Law School, Minneapolis, MN, for Amicus Curiae, MN Coalition for Battered Women.

## OPINION

ANDERSON, PAUL H., Justice.

David Eugene Wright was charged in Hennepin County with two counts of second-degree assault and one count of being a prohibited person in possession of a firearm. The assault charges stemmed from an incident in which Wright allegedly pointed a firearm at his then-girlfriend and her sister. Shortly before Wright's trial was to begin, the district court determined that the girlfriend and her sister were unavailable witnesses, and ruled that statements the two women made to a 911 operator and to police officers during an initial on-scene investigation were admissible as excited utterances.

Following his conviction on all three counts, Wright appealed to the Minnesota Court of Appeals, arguing that the district court abused its discretion by admitting the statements. *State v. Wright (Wright I)*, 686 N.W.2d 295, 298 (Minn. App.2004). While Wright's appeal was pending, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that the Confrontation Clause bars the admission of "testimonial statements" of a witness, with certain limited exceptions). Applying *Crawford*, the court of appeals concluded that the state-

ments the girlfriend and her sister made to the 911 operator were nontestimonial and were therefore admissible. *Wright I*, 686 N.W.2d at 302. The court did not reach the issue of whether the women's statements to the police were testimonial, having decided that if the district court committed error by admitting these statements, the error was harmless. *Id.* at 305.

Wright appealed to our court and we affirmed the court of appeals, but on slightly different grounds. *State v. Wright (Wright II)*, 701 N.W.2d 802 (Minn.2005). Wright then petitioned the United States Supreme Court for writ of certiorari. While Wright's petition was pending, the Court decided *Davis v. Washington*, 547 U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (holding that witness statements made during a police interrogation are testimonial, unless the purpose of the interrogation is to meet an ongoing emergency). Shortly thereafter, the Court granted Wright's petition, vacated our judgment, and remanded Wright's case for further consideration in light of *Davis*. *Wright v. Minnesota*, —— U.S. ——, 126 S.Ct. 2979, 165 L.Ed.2d 985 (2006). After further consideration, we remand for further proceedings consistent with this opinion.

On November 24, 2002, appellant David Eugene Wright was living with his girlfriend, R.R., in an apartment on Oak Grove Street in Minneapolis.[1] At about 3 a.m., a Minneapolis 911 operator received a hang-up call originating from R.R.'s apartment at the Oak Grove Street address. The operator dispatched police officer Mark Lanasa to that address. While Lanasa was en route, the 911 operator received a second call from the same location, during which R.R. told the operator

---

1. Many of the facts in this opinion are taken from our earlier opinion in *State v. Wright,*

701 N.W.2d 802 (Minn.2005).

that Wright had "pulled a gun on me and my little sister." In response to the operator's questioning, R.R. provided Wright's name and a physical description of him. She also told the operator that Wright had keys to her apartment, and that she was worried he might return. R.R. told the operator: "I'm so scared right now, ma'am. I'm sorry I don't want to talk too loud." The operator assured R.R. that the police were en route to her apartment building, and asked a number of questions about how the officers could gain entrance to the building once they arrived. Shortly thereafter, the operator said, "You know what [R.R.], the police are there now, ok?"

R.R. then put her sister on the phone. After a brief exchange between the operator and the sister, the operator instructed the women to "stay in that apartment" and said, "The police are following him outside. Ok? So he's not in the building." After another brief exchange in which the operator asked where R.R. and her sister were in the apartment building, the operator said, "Ok. You know what? I believe that they have him right now, ok?" The operator proceeded to comfort and reassure the sister, then stated, "They do have him in custody." The operator told the sister that the police would be coming back to the apartment to talk to R.R. and her sister. The sister asked if the police could get R.R.'s keys from Wright, and the operator replied, "They'll end up taking everything off of him."

At some point during the 911 call, the operator relayed to Officer Lanasa the information provided by R.R., including a physical description of Wright. As Lanasa was receiving the information from the 911 operator, he noticed a man matching Wright's description on the sidewalk west of LaSalle Street on Oak Grove. Lanasa turned his car around to face the direction that the man was walking. He then yelled

at the man to stop and to raise his hands, but the man took off running. Wright, who was the man Lanasa spotted, testified that he ran because it was late at night and he was scared and uncertain about what would happen.

Lanasa testified that as he followed Wright in the squad car, he noticed Wright holding a black, semi-automatic handgun in his right hand. Wright turned into an alley and was traveling through the alley when Lanasa came around the corner and noticed that Wright's hands were empty. Wright then climbed over an eight-foot high chain link fence. Lanasa again yelled at Wright to stop and threatened to release a police dog if Wright did not stop. Lanasa testified that Wright continued running, but Wright testified that at this point he stopped and put his hands in the air.

Lanasa testified that he traveled around the block, positioned his squad car beside Wright, and pushed a button to open the door that released the police dog, which pursued Wright. The dog caught up to Wright and grabbed him by the right leg. Lanasa, who continued to pursue Wright, jumped out of his car with his gun drawn, forced Wright to the ground, and told Wright to show his hands. Wright kicked at the dog while the dog bit him, and Lanasa then took action to subdue Wright. Lanasa testified that Wright subsequently put out his hands and said, "I don't have the gun anymore." Lanasa then handcuffed Wright. At trial, Wright denied having had a gun in his hands while Lanasa chased him. Wright also testified that he did not say that he no longer had a gun because there was no reason for him to make such a statement.

A police officer who arrived to assist Lanasa searched the scene and found a gun under a parked car in a lot near the alley that Wright traveled through as La-

nasa was chasing him. The gun was a Smith & Wesson, 915 semi-automatic. Lanasa testified that this gun appeared to be the same weapon he saw Wright holding in his right hand, but there were no fingerprints matching Wright's on the gun.

Meanwhile, at 3:13 a.m., Officer Heidi Weeks and her partner were dispatched to the Oak Grove address to begin an initial, on-scene field investigation. While en route, the officers heard Lanasa broadcast over the police radio that he had been chasing Wright. Weeks and her partner went to assist Lanasa, and when they arrived at the scene of the arrest, they placed Wright in the back seat of their squad car. Weeks and another officer, Adam Lewis, then walked to R.R.'s apartment.

When Weeks and Lewis arrived at the apartment building around 3:45 a.m., they observed that R.R. was crying and shaking uncontrollably, and trying to take deep breaths to calm herself. R.R. was having a hard time talking to the officers, and told the officers that she was really scared. Lewis asked R.R. if they could go up to her apartment to take her statement because the apartment building doorway was small and there was no place to sit. When the officers arrived at the apartment, R.R.'s sister was sitting on the sofa, crying.

Weeks spoke to R.R. for about a half hour. Weeks testified that throughout their conversation, R.R.'s demeanor did not change—"[s]he continued to cry and sob and have a hard time breathing in talking to us throughout the time that I was speaking with her." R.R. said she was concerned about whether Wright was in custody and whether he might be released. While Weeks talked with R.R., Lewis talked with R.R.'s sister, who described the events in a manner consistent with R.R.'s description. R.R.'s sister also told Lewis that she was "scared to death," and that she believed Wright would return and shoot her. R.R. and her sister then continued to recount the evening's events to the officers.

R.R. and her sister did not testify at Wright's trial, but their descriptions of the evening's events were introduced through the police officers' testimony. Wright's testimony concerning the events was largely consistent with the descriptions from R.R. and her sister, with some minor exceptions and one significant exception: his denial that he was pointing a gun at R.R. and her sister—the act that gave rise to the felony assault charges. Unless otherwise noted, the facts recited below are consistent with both versions of the events.

During the field investigation interview at her apartment, R.R. told Weeks that she had lived in the apartment since the beginning of the month, and Wright had moved in with her about two weeks later. Wright testified that at the time of the incident, his relationship with R.R. had not been going well. He said that earlier that evening, R.R. came home late from work and rang the apartment to be let in because she did not have her keys. R.R.'s sister came to the door, told R.R. that Wright did not want to let R.R. into the apartment, but then let her in anyway. Wright testified that he and R.R. argued about her plans to go to a dance club. He said they then agreed that their relationship was not working, and decided to "leave each other alone."

At about 10:30 p.m., R.R. and her sister left the apartment. Wright said R.R. left for a dance club and her sister went to a party. R.R.'s sister was expected to return by 11:30 p.m. Wright had the apartment keys because he thought he was going to be leaving shortly, but instead he fell asleep on the sofa while waiting for R.R.'s sister to return. He awoke around

11:30 or 11:40 p.m. when R.R.'s sister telephoned to explain that she was on her way, and then he fell asleep again. At about 1:10 a.m., Wright awoke when R.R. telephoned, asking to be let into the building. When Wright left the apartment to let R.R. in, he saw R.R.'s sister sleeping in the hallway. The sister apparently had returned while Wright was asleep. Wright woke her up and told her to go inside the apartment. When Wright met R.R., he told her that her sister had been sleeping in the hallway, and R.R. then became upset.

When Wright returned to the apartment with R.R., her sister was inside. Wright testified that he played video games while R.R. tried to sleep. Both R.R. and her sister made some comments to Wright about how he was irresponsible, and R.R. told Wright that their relationship was over. Wright told R.R. he would leave "on the first of the month."

Shortly thereafter, Wright put on his coat and said he was going to leave. Wright testified that he did not want to argue all night and thought that if he left and came back after R.R. had fallen asleep, he would not have to deal with her. Wright testified that when he went to retrieve the keys from the counter on which he had left them, he noticed that they were no longer there. Wright said that he asked R.R. for the keys, but she refused to give them to him. A heated argument ensued. At one point, R.R.'s sister tried to call 911, but Wright grabbed the telephone, pulled the receiver from the wall, and smashed it. Officer Lewis testified that he found a broken phone with a cracked receiver when he interviewed R.R.'s sister.

During the police interview, R.R. told Officer Weeks that Wright said "I'll show you" and he walked to the front closet, retrieved a dull silver and black gun from a black backpack, and returned to the living room. Wright then pointed the gun, which R.R. thought was loaded, at R.R.'s sister. Next, he pointed the gun at R.R. and said "little girl, shut your mouth," and then pointed the gun back at R.R.'s sister. Wright then left the apartment, at which time R.R. dialed 911 from a telephone in the bedroom. While interviewing R.R., Weeks found a black backpack in the front closet, which held a gun clip containing a few hollow-point rounds that could be used in the gun found in the parking lot.

Wright was charged with two counts of felony assault in the second degree, based on allegedly having pointed a gun at R.R. and her sister, in violation of Minn.Stat. § 609.222, subd. 1 (2004). Wright also was charged with one count of being a prohibited person in possession of a firearm, also a felony, in violation of Minn.Stat. § 624.713, subds. 1(b) and 2 (2004). While preparing the case against Wright, the Hennepin County Attorney's office repeatedly telephoned R.R.'s sister, but was unable to reach her. A police investigator attempted several times to reach R.R., and when R.R. finally responded to a telephone call, she told the investigator that she did not want to participate in the case. The investigator went to R.R.'s residence to deliver a subpoena, and when no one answered, he slid the subpoena under the apartment door. A domestic violence victims' advocate told the court that she had spoken with R.R., who said that she was concerned for her safety and her sister's safety if they were to testify. R.R. also was concerned that Wright still might have keys to her apartment, and told the victims' advocate that Wright had been telephoning her from jail. According to the advocate, Wright told R.R. that "if she doesn't do what he wants someone will come over to her house and do something to her." The advocate told the court that

R.R. subsequently stated that "the phone calls [from jail] were not threatening, they were regarding [Wright's] clothes."

Based on the foregoing information, the district court deemed both R.R. and her sister unavailable to testify. The court then admitted into evidence a tape and a transcript of the 911 call, as well as the statements R.R. and her sister made to the police. The court ruled that the statements were admissible under the excited utterance exception to the hearsay rule. The court explained that the statements made to officers Weeks and Lewis at the apartment were distinguishable from formal police interviews. The court found that these statements were made "quite soon after the incident," were related to the assault, and were made while R.R. and her sister were "still under the influence [of the incident], still tearful, crying, very upset, had difficulty calming [ ] down, were still quite frightened."

A jury returned a verdict of guilty on all counts charged. The district court convicted Wright of two counts of assault in the second degree and one count of being a prohibited person in possession of a firearm and imposed a sentence of 60 months for each count, to be served concurrently.

Wright appealed his convictions to the court of appeals, arguing that the district court abused its discretion by (1) admitting as excited utterances the statements R.R. and her sister made during the 911 call and the on-scene statements they made to police; (2) admitting the statement Wright made when police subdued him because he did not voluntarily make the statement; and (3) ruling that Wright could be impeached with his prior convictions. *Wright I,* 686 N.W.2d at 298. Wright also argued that the state committed prejudicial misconduct during its closing argument. *Id.* In March 2004, while Wright's case was pending before the court of ap-

peals, the United States Supreme Court issued its decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The parties then addressed the *Crawford* issue in supplemental briefing.

The court of appeals affirmed Wright's convictions. *Wright I,* 686 N.W.2d at 298. With respect to Wright's first claim—that the district court improperly admitted the statements R.R. and her sister made during the 911 call and to the responding police officers—the court of appeals determined that the statements during the 911 call were not testimonial and did not therefore implicate Wright's Confrontation Clause rights. *Id.* at 302–03. The court did not reach the issue of whether the statements to police were testimonial, having concluded that any error the district court may have committed in admitting these statements was harmless beyond a reasonable doubt. *Id.* at 305.

We granted Wright's petition for review only with respect to the *Crawford* issue—specifically, whether Wright's Confrontation Clause rights were violated when the district court admitted the statements R.R. and her sister made to the 911 operator and to the police. We held that statements made to a 911 operator and to police during an "initial, on-scene field investigation" by an unavailable witness must be analyzed on a case-by-case basis to determine whether they are testimonial under *Crawford. Wright II,* 701 N.W.2d at 811–12. As to the statements R.R. and her sister made to the 911 operator, we concluded that they were nontestimonial given "the demeanor of the victims, the temporal proximity [of the call] to the incident, and the nature of the dialogue between the victims and the 911 operator." *Id.* at 811.

We also concluded that the statements R.R. and her sister made to the police were nontestimonial. *Id.* at 814. In

reaching this conclusion, we weighed a variety of factors and ultimately determined that (1) in questioning R.R. and her sister, the police officers were seeking to make a "preliminary determination of 'what happened' and whether there was immediate danger, rather than * * * to gather evidence for a future trial"; and (2) in making their statements, R.R. and her sister were "concerned about Wright's ability to harm them in the future," and were not contemplating the trial that might arise from Wright's actions that night. *Id.* at 813–14.

Wright petitioned the Supreme Court for writ of certiorari on November 8, 2005. On June 19, 2006, the court decided *Davis v. Washington* (*Davis/Hammon*), 547 U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).[2] Eleven days later, the Court granted Wright's petition, vacated our court's judgment, and remanded the case to us for further consideration in light of *Davis/Hammon.* In compliance with our order, the parties filed supplemental briefs and provided oral argument addressing the effect of *Davis/Hammon* on the admissibility of the statements R.R. and her sister made during the 911 call and to responding police.

## I.

■ Generally, we will not reverse a district court's evidentiary rulings absent a clear abuse of discretion. *State v. Caulfield,* 722 N.W.2d 304, 308 (Minn.2006). But whether the admission of evidence violates a criminal defendant's Confrontation Clause rights is a question of law we review de novo. *Id.*

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees that every criminal defendant "shall enjoy the right * * * to be confronted with the witnesses against him." In *Crawford,* the Supreme Court interpreted this clause to bar the admission of "testimonial statements" made by a declarant out of court, unless the declarant is unavailable to testify at trial and the defendant has had a prior opportunity for cross-examination. 541 U.S. at 53–54, 124 S.Ct. 1354. As we acknowledged in *Wright II,* the Supreme Court in *Crawford* did not "comprehensively define the types of statements that are to be considered testimonial" and instead identified "three 'formulations of [the] core class of "testimonial" statements.'" 701 N.W.2d at 809 (quoting *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354).

The Supreme Court recently supplied some of the definition that was lacking in *Crawford.* In *Davis/Hammon,* the Court clarified that the inquiry as to whether a statement is testimonial centers on the *primary purpose* the statement serves. 126 S.Ct. at 2273–74. Specifically, the Court stated:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* (emphasis added).

*Davis/Hammon* consolidated two state court cases—*State v. Davis* and *Hammon v. State*—in order to analyze the nontesti-

---

2. *Davis v. Washington* consolidated two state court cases—*State v. Davis* and *Hammon v. State,* 126 S.Ct. at 2270–72. To avoid confu- sion, we will refer to the case as *Davis/Hammon* when discussing the Supreme Court's opinion as a whole.

monial/testimonial distinction as respectively applied to (1) statements made to a 911 operator; and (2) statements made to the police during an initial, on-scene investigation. *Id.* at 2270–72 (setting forth the relevant facts from *Davis,* 154 Wash.2d 291, 111 P.3d 844 (2005), and *Hammon,* 829 N.E.2d 444 (Ind.2005)). Accordingly, we rely on the Supreme Court's analysis of *Davis* and *Hammon,* respectively, to guide our reconsideration of the admissibility of statements R.R. and her sister made to the 911 operator and to the police.

*Statements to the 911 Operator*

The facts surrounding the 911 call in *Davis* were as follows. In response to a series of questions from a 911 operator,[3] the female victim described a domestic assault that was underway. 126 S.Ct. at 2271. She told the operator that her former boyfriend was "jumpin' on [her] again," and that he was "usin' his fists." *Id.* She also provided her former boyfriend's name before telling the operator that he "had 'just r[un] out the door' * * * and that he was leaving in a car with someone else." *Id.* The operator then told the victim to "stop talking" and to answer the operator's questions. *Id.* The operator then proceeded to gather additional information about the former boyfriend, including his birthday, his purpose in coming to the victim's house, and the context of the assault. *Id.* Just before the call ended, the operator told the victim that the police were on their way. *Id.*

After reaffirming that " 'testimony' * * * is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact,' " *id.* at 2274 (citations omitted), the Supreme Court concluded that the victim/caller in *Davis* did not make testimonial statements in response to the 911 operator's "interrogation"—at least not up to the point at which the operator told the victim to "stop talking."[4] *Id.* at 2277. The Court then identified four circumstances that distinguished the *Davis* and *Crawford* interrogations: (1) the *Davis* victim was "speaking about events *as they were actually happening,* rather than 'describ[ing] past events' "; (2) "any reasonable listener would recognize that [the *Davis* victim] was facing an ongoing emergency"; (3) the questions and answers during the 911 call in *Davis* were, when viewed objectively, necessary to resolve the present emergency; and (4) the *Davis* victim was providing "frantic answers" over the telephone, not responding calmly to station house questioning. *Id.* at 2276–77 (citation omitted). The Court stated that the foregoing circumstances "objectively indicate [that the] primary purpose [of the *Davis* interrogation] was to enable police assistance to meet an ongoing emergency," and that the victim "simply was not acting as a *witness* " and "was not *testifying.*" *Id.* at 2277.

■ Without the benefit of the guidance *Davis/Hammon* ultimately provided, we held in *Wright II* that statements made during 911 calls and during initial, on-scene police investigations must be ana-

---

3. The Supreme Court noted that for the purposes of its *Davis* opinion, 911 operators are "agents of law enforcement [officers] when they conduct interrogations of 911 callers." 126 S.Ct. at 2274 n. 2.

4. The Supreme Court acknowledged that at this point in the call, "it could readily be maintained that" the victim's answers evolved into testimonial statements because, after the former boyfriend drove away, "the emergency appears to have ended." 126 S.Ct. at 2277. The Court then noted that trial courts should be prepared to "redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." *Id.*

lyzed on a case-by-case basis to determine whether they are testimonial. 701 N.W.2d at 811–12. We went on to conclude that the statements R.R. and her sister made to the 911 operator were nontestimonial because the circumstances surrounding the call suggested that the call was placed to seek help "in the face of immediate danger," and that during the call, "the operator focused only on obtaining information for an immediate intervention rather than a future prosecution." *Id.* at 811. In support of this conclusion, we noted that "R.R. called 911 shortly after Wright left the apartment, and the call ended immediately after the 911 operator confirmed that Wright had been apprehended." *Id.* In sum, we inquired into the *primary purpose* of the 911 call and determined after doing so that the call was "to enable police assistance to meet an ongoing emergency." *See Davis/Hammon*, 126 S.Ct. at 2273.

Our analysis in *Wright II* comports well with the Supreme Court's reasoning in *Davis/Hammon*, but we note that there may be a potentially significant factual distinction between the cases. Specifically, R.R. called 911 after Wright had left the apartment, whereas the *Davis* victim called while the perpetrator was still on site. On the basis of this factual distinction, Wright asserts that at least part of R.R.'s 911 call occurred after the emergency had ended. Wright concedes that while he was still "at large" with R.R.'s keys, R.R.'s statements to the operator constituted a "call for help" and were therefore nontestimonial. But he contends that the emergency objectively ended once the police arrived at the site of R.R.'s apartment building and began pursuing him. Wright asserts that statements R.R. and her sister made to the 911 operator after this point were testimonial. The state concedes that the 911 call "may need" to be divided into nontestimonial and testimonial parts based on when the emergency objectively ended, but it would draw the line later in the conversation, at the point the operator informed R.R.'s sister that police had Wright in custody.

We conclude that *all* the statements R.R. and her sister made to the 911 operator in this case are nontestimonial under *Davis/Hammon* and were therefore admissible at Wright's trial. As previously noted, *Davis/Hammon* defines testimonial statements as those made

> when the circumstances objectively indicate that there is no * * * ongoing emergency, and *that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.*

126 S.Ct. at 2273–74 (emphasis added). The foregoing definition provides two indicia of testimonial statements: (1) they are made after an emergency has passed; and (2) they are made in the context of an interrogation conducted for the primary purpose of establishing or proving past events.

We conclude that the latter part of R.R.'s 911 call—that is, the part of the call after the operator relayed to R.R.'s sister that Wright was in custody—is distinguishable from the post-emergency part of the *Davis* call with regard to the second of the foregoing indicia articulated by the Supreme Court. As soon as the emergency objectively ended in *Davis*, the 911 operator proceeded to ask a number of questions that elicited responses of a factual nature, such as the former boyfriend's birth date and the "context of the assault." *Id.* at 2271. The primary purpose of the post-emergency exchange in *Davis* was to establish or prove facts. Here, the 911 operator apparently attempted to terminate the call after relaying to R.R.'s sister the information that police had apprehended Wright. The operator said:

Ok. [The police] want you to go back up to the apartment right now. Ok? And I'll let them know that the buzzer doesn't work. So I'll see if they can give you a buzz there on the phone[,] ok?

The foregoing statement would have been the end of the call, but for R.R.'s sister's explicitly expressed need for reassurance that the police had really apprehended Wright, not someone else, and that the police would take the apartment keys away from him. After making the foregoing statement, the 911 operator did not attempt to establish or prove any facts; her sole purpose was to calm R.R.'s sister and to encourage her to return to the apartment to wait for the police to arrive.[5] Similarly, the sole purpose of the sister's comments and questions was to ascertain that the emergency was indeed over. In seeking reassurance from the 911 operator, the sister repeated a number of facts already established by R.R.—including Wright's name and physical description—but it cannot be said that the primary purpose of any part of the 911 call was to establish or prove past events potentially relevant to later criminal prosecution. We therefore hold that the district court did not violate the Confrontation Clause when it admitted all of the 911 call.

*Statements to the Police*

We next address the statements that R.R. and her sister made to the police. In order to do so, a review of the underlying facts in the *Hammon* part of *Davis/Hammon* is in order.

The domestic disturbance in *Hammon* was apparently over by the time the police arrived at the scene because the police found the victim on the front porch of her house and her husband in the kitchen. 126 S.Ct. at 2272. The state ultimately charged the husband with domestic battery, and although the wife was subpoenaed, she did not appear at trial. *Id.* Over the husband's objection, the district court allowed one of the responding officers to testify about statements the wife made during the on-scene investigation. *Id.* In her statements to the police, the wife described the assault in detail as well as the events leading up to the assault. *Id.* at 2272–73.

The Supreme Court concluded that for Confrontation Clause purposes, the wife's statements "were not much different from the statements we found to be testimonial in *Crawford*," *id.* at 2278, despite the fact that the statements at issue in *Crawford* were made in the context of an interrogation conducted in custody and after the declarant received *Miranda* warnings. *Id.* at 2282 (Thomas, J., concurring in part and dissenting in part). In support of its conclusion, the Court stated:

> It is entirely clear from the circumstances [in this case] that the interrogation was part of an investigation into possibly criminal past conduct * * *. There was no emergency in progress; * * *. [The officer] was not seeking to determine (as in [the *Davis* 911 call]) "what is happening," but rather "what happened." Objectively viewed, the pri-

---

**5.** The Supreme Court stated in *Davis/Hammon* that a declarant (i.e., a 911 caller) could theoretically make testimonial statements even if she were not answering an interrogator's (i.e., 911 operator's) questions. 126 S.Ct. at 2274 n. 1 (reasoning that "[t]he Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation"). Thus, our conclusion that the call in this case is distinguishable from the call in *Davis* does not turn on the absence of actual questioning by the 911 operator after Wright was apprehended. It turns instead on the *purpose* of the dialogue—objectively viewed—from that point forward.

mary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime * * *.

*Id.* at 2278.

■ We agree with Wright's argument that just as in *Davis/Hammon,* the police interviews in this case occurred after the emergency had ended and were conducted in order to establish events potentially relevant to the future prosecution of Wright. Indeed, by the time police interviewed R.R. and her sister, Wright was in police custody.[6] Because the statements R.R. and her sister made to police fall squarely within the category of statements the *Davis/Hammon* Court deemed barred by the Confrontation Clause, we hold that it was error for the district court to admit these statements at Wright's trial.

## II.

■ Our conclusion that the district court violated Wright's Confrontation Clause rights by admitting the on-scene statements to the police does not end our inquiry. As we stated in *State v. Courtney,* "it is well settled that violations of the Confrontation Clause are subject to [a harmless error] analysis," and a new trial is not warranted if the violation is harmless beyond a reasonable doubt. 696 N.W.2d 73, 79–80 (Minn.2005). In order to deem a Confrontation Clause error harmless beyond a reasonable doubt, we must determine that

> the guilty verdict actually rendered was "surely unattributable" to the error. When determining whether the jury's verdict was surely unattributable to an

error, we examine the record as a whole. In doing so, we consider the manner in which the evidence was presented, whether the evidence was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defense. Evidence of the defendant's guilt is also a relevant consideration, but it is not the sole factor.

*Id.* at 80 (citations omitted).

Wright argues that the court of appeals misapplied the harmless error test by focusing exclusively on whether there was sufficient other evidence of Wright's guilt to sustain the jury's verdict. We agree that in light of *Courtney* and other recent cases, the court of appeals did not adequately address other relevant factors. *See Caulfield,* 722 N.W.2d at 314; *State v. Al–Naseer,* 690 N.W.2d 744, 748 (Minn. 2005) (noting that "overwhelming evidence of guilt" is often a very important factor in the harmless error analysis but stating that "the court cannot focus on the evidence of guilt alone"). In *Caulfield,* we cited to *Al–Naseer* and applied the same factors set forth in *Courtney,* in addition to the " 'overwhelming evidence' factor," to determine whether a Confrontation Clause violation was harmless beyond a reasonable doubt. *Caulfield,* 722 N.W.2d at 314–15.

In accord with our foregoing case law, we first examine the manner in which the state presented the on-scene statements to the police. We note that as in *Caulfield, id.* at 314, the trial in this case "was a very short affair," comprising approximately four hours of testimony from seven wit-

---

**6.** Amici Minnesota Coalition for Battered Women and Battered Women's Justice Project contend that, although Wright had been apprehended by the time the interviews took place, the emergency was nonetheless ongoing, and the primary purpose of the investigation was to assess the danger Wright posed and whether police should further detain him. This argument is unpersuasive in light of the facts in *Hammon:* unlike Wright, the perpetrator in that case was still on the scene when the police arrived and he aggressively attempted to interfere with the investigation. 126 S.Ct. at 2272.

nesses, plus closing arguments. Therefore, there is little chance that the on-scene statements were "lost among a plethora of other evidence." *Id.* The state expressly referred to the statements in its brief opening statement, cuing the jury to listen for Officer Weeks' testimony on how R.R. "described what had happened and how her boyfriend, David Wright, * * * pointed a firearm at her and also her sister" and for Officer Lewis's testimony on how R.R.'s sister "described what had happened to them when [Wright] pointed the handgun at them." The state introduced the statements "in the logical flow" of the two officers' testimony, for the apparent purpose of describing the events leading up to the alleged assaults, the alleged assaults themselves, and the fear that R.R. and her sister experienced. *See id.* Finally, we note that the jury was likely to find the state's witnesses who relayed the statements to be highly credible—Weeks and Lewis were police officers who arrived on the scene of the alleged assaults shortly after they occurred.

The second factor we address under *Courtney* is whether the on-scene statements were highly persuasive. The statements in this case came directly from the victims, neither of whom testified. Moreover, the statements were dramatic and highly probative of both the assault and gun possession charges Wright faced. Officer Lewis told the jury that as soon as R.R. opened the door, she told him that she was "really scared." R.R. also told Lewis about the events leading up to the alleged assaults, the alleged assaults themselves, and the gun. R.R.'s sister told Lewis that Wright's actions "scared [her] to death," that "she thought she was going to get shot," and that she was "very concerned about the release of [Wright] because * * * she thought that he might come back and shoot her." Weeks told the jury about R.R.'s description of what hap-

pened earlier in the evening, the arguments that culminated in the alleged assault, and the alleged assault itself. Weeks testified that according to R.R.,

> Wright then got the apartment keys from her sister, he went to the front closet, got a gun out and said, "I'll show you." He then returned to the living room, pointed the gun at her sister, pointed the gun at [R.R.] and said, "Little girl, shut your mouth," then pointed the gun back at [R.R.'s] sister and then walked out of the apartment.

Weeks told the jury that R.R. said "when she saw the gun she believed that it was loaded and thought that he was going to shoot her," and that "she was in fear for her life."

We conclude that the jury likely found the on-scene statements to the police highly persuasive regarding the assault and gun possession charges. As the court of appeals' dissent stated,

> Because neither R.R. nor [her sister] testified at trial, the state's entire case rested on the 911 call and the victims' police interview. The interview elicited new information such as the description of the gun, [Wright's] threatening statements, and the victims' states of mind when the gun was pointed at them.

*Wright I,* 686 N.W.2d at 312 (Hudson, J., dissenting). When persuading the district court to admit the on-scene statements, the state itself described those statements as "very relevant and necessary to the state's case," and "highly probative and necessary to a full, fair determination of this case."

As to the third factor relevant to our harmless error analysis under *Courtney,* we note that the state referred to the on-scene statements—in general terms and sometimes with reference to specific comments—numerous times during its rela-

tively short closing argument. For example, regarding the "intent to cause fear" element of assault, the state told the jury,

> That gun * * * put [R.R.] in fear of her life. That gun * * * put [R.R.'s sister] in fear of her life. When [Wright] went to the closet and grabbed the gun and said, "I am going to show you," and "Little girl, shut up" and pointed the gun, they thought they were going to die.

The fourth *Courtney* factor—whether the defendant effectively countered the inadmissible evidence—poses a difficult question in the context of this case. Wright's cross-examinations of Lewis and Weeks were very brief: he asked each officer only two or three questions about what happened in the apartment between Wright and the victims. His questions highlighted the fact that neither witness had firsthand knowledge of the assaults or the events leading up to them. Wright returned to this lack of firsthand knowledge theme in his closing argument when he told the jury that the state's witnesses could not "be questioned about things that only the people who were there can tell you about." He also emphasized that because R.R. and her sister did not appear as witnesses, the jury was unable to assess their credibility or to hear, for example, if their descriptions of events in the apartment might have been influenced by drugs or alcohol. Finally, he attempted to cast doubt on the credibility of Lewis and Weeks by highlighting inconsistencies in their testimony.

When analyzing the fourth *Courtney* factor—whether Wright effectively countered the inadmissible on-scene statements—"our inquiry is to estimate the impact that the [statements] may have had on the decision of guilt." *Caulfield*, 722 N.W.2d at 315. In this case—given the statements' dramatic and highly persua-sive nature and the manner in which they were presented and used by the state—the counterweight Wright provided through cross-examination and closing argument was insufficient. *See id.* Therefore, we are unable to conclude that Wright "effectively countered" the statements.

The final factor in our harmless error analysis is the strength of the "other evidence" against Wright—in this case, evidence other than the on-scene statements. The court of appeals' majority concluded that "the other evidence more than supports" a finding, beyond a reasonable doubt, that Wright illegally possessed a gun. *Wright I*, 686 N.W.2d at 304. The majority also concluded that the admissible evidence against Wright as to assault was "overwhelming." *Id.* We agree that the other evidence against Wright was strong, but this factor does not dispose of the harmless error inquiry. As we have previously stated, "[T]hat the evidence [is] sufficient, or even overwhelming, does not mean that the error was necessarily harmless." *Caulfield*, 722 N.W.2d at 316 (quoting *State v. Juarez*, 572 N.W.2d 286, 291 (Minn.1997)). "[T]he inquiry is not 'whether a jury would have convicted the defendant without the error, rather * * * whether the error reasonably could have [had an impact on] * * * the jury's decision.'" *State v. King*, 622 N.W.2d 800, 809 (Minn.2001) (quoting *Juarez*, 572 N.W.2d at 292).

In this case, the state presented the inadmissible statements in a compelling manner. The statements were highly persuasive, and they featured prominently in the state's closing argument. We therefore conclude that although Wright countered the statements as effectively as he could have and the other evidence against him was strong, the district court's error in admitting the on-scene statements rea-

sonably could have had an impact on the jury's decision. Therefore, because we cannot say that the jury's verdict was "surely unattributable" to the admission of the statements, we hold that the error was not harmless beyond a reasonable doubt. The consequence of our holding is that Wright is entitled to a new trial—unless he forfeited his confrontation claim by wrongfully procuring the unavailability of R.R. and her sister. *See Wright II*, 701 N.W.2d at 814 (citing *Crawford,* 541 U.S. at 62, 124 S.Ct. 1354). It is to the issue of forfeiture that we next turn.

### III.

■■■ In *Davis/Hammon*, the Supreme Court reaffirmed the longstanding principle that a criminal defendant may not exploit the Confrontation Clause to bar the statements of a witness whom the defendant himself has caused to be unavailable:

> [W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford:* that "the rule of forfeiture by wrongdoing * * * extinguishes confrontation claims on essentially equitable grounds."

126 S.Ct. at 2280 (quoting *Crawford,* 541 U.S. at 62, 124 S.Ct. 1354). In *Wright II,* we stated that

> [i]n Minnesota, a defendant will be found to have forfeited [his confrontation claim] if the state proves that the defendant engaged in wrongful conduct, that he intended to procure the witness's unavailability, and that the wrongful conduct actually did procure the witness's unavailability.

701 N.W.2d at 814–15 (citing *State v. Fields,* 679 N.W.2d 341, 347 (Minn.2004)).[7]

The state argues that "information already in the record is sufficient to show [Wright's] forfeiture by wrongdoing." The state nonetheless asks us to remand to the district court for a finding on forfeiture because in *Wright II,* we declined to consider the issue. 701 N.W.2d at 815. Wright asserts that (1) the district court already held a "forfeiture hearing"; (2) no forfeiture occurred based on evidence already in the record; and (3) the state should not be afforded a "second bite of the apple"—that is, a second chance to prove that R.R. failed to testify because of improper conduct by Wright.

One reason we declined to consider the forfeiture issue in *Wright II* was our determination that the "district court did not engage in factfinding or issue conclusions regarding whether Wright procured the unavailability of R.R. or her sister." 701 N.W.2d at 815. Having reviewed the record a second time, we remain certain that, contrary to Wright's assertion, the district court did not hold a forfeiture hearing in

---

**7.** The state's burden of proof on forfeiture is a preponderance of the evidence. *See Davis/Hammon,* 126 S.Ct. at 2280 ("[F]ederal courts using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard, * * *. [S]tate courts tend to follow the same practice * * *." (citations omitted)). *See* *also United States v. Balano,* 618 F.2d 624, 629 (10th Cir.1979) ("[T]he judge must * * * find by a preponderance of the evidence that the defendant's coercion made the witness unavailable."), *abrogated on other grounds by Richardson v. United States,* 468 U.S. 317, 325–26, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984).

this case. The court described the purpose of the relevant part of the pretrial evidentiary hearing as "lay[ing] a factual record for [the state's] argument about unavailable witnesses." The focus of the questioning was the extent of the state's efforts to secure the testimony of R.R. and her sister, and in 38 pages of transcript, neither the court nor the parties used the term "forfeiture."

Moreover, testimony related to whether Wright engaged in any wrongdoing comprised only part of the direct and cross-examinations of a single witness—a victims' advocate with the Hennepin County Attorney's Office. The advocate said that R.R. told her that (1) R.R. did not want to testify because she was concerned for her safety generally; and (2) Wright told R.R., during one of the telephone calls he made to her from jail, that "if she [didn't] do what he want[ed,] someone [would] come over to her house and do something to her." The advocate testified that R.R. told her R.R. did not want Wright to know about the conversation between R.R. and the advocate. The advocate also said that at a later time and in the presence of Wright's attorney, R.R. said that the phone calls were not threatening, "they were regarding [Wright's] clothes, something to the [effect] that it had all been worked out."[8] The foregoing testimony comprises the substance of the trial record regarding the connection—if any—between Wright's conduct and the unavailability of R.R. and her sister. While the district court ultimately ruled that both

R.R. and her sister were "unavailable witnesses under the [rules of evidence] definitions," it did not reach any conclusion as to forfeiture.

 As stated above, both parties assert that the record regarding forfeiture is sufficient to sustain a conclusion by our court in their favor. We disagree. The relevant testimony from the victims' advocate is relatively brief and encompasses conflicting accounts of Wright's post-arrest communications with R.R. More importantly, we are not in a position to assess the advocate's credibility. For the foregoing reasons, we conclude that the record does not provide a sufficient basis for us to decide whether Wright engaged in wrongful conduct with the intent to procure the unavailability of R.R. and her sister, or whether his conduct actually caused their unavailability.

Having determined that the district court did not make a finding on forfeiture and that the record is insufficient to support a conclusion by our court on the issue, we next turn to the question of how the district court should proceed on remand. Specifically, we must address whether the state may introduce new evidence during a pretrial hearing to determine whether Wright forfeited his confrontation claim. Wright argues that "even if" the district court did not previously make a forfeiture finding, allowing the state to present additional evidence—and specifically, "to impeach its own witnesses"—in order to prove forfeiture on remand would violate

---

8. Apparently the victims' advocate continued speaking to R.R. after Wright's attorney left the meeting in which R.R. denied that she had received a threatening call, prompting the following exchange during Wright's pretrial evidentiary hearing:

State: What was the tenor of that conversation [after Wright's attorney left]?

Advocate: [R.R.] didn't want to testify, she told the police that from the very beginning and something about the phone calls, if they were threatening. I would have to refer to my notes.

State: Please do.

Advocate: If he did threaten her on the phone, he does not want that [to be] the reason he is locked up.

"the integrity of the criminal justice system" and Wright's due process rights.

■ We will not remand a case "for more definite findings when it is clear that the district court considered and decided the fact issue in question." *State v. Licari*, 659 N.W.2d 243, 255 (Minn.2003). But when the court did not reach the factual issues deemed necessary on appeal for the resolution of the case, our case law supports a conclusion that remanding for an evidentiary hearing does not violate a criminal defendant's due process rights. For example, in *State v. Weekes*, the defendant argued that we should reverse his conviction because the district court admitted an inculpatory statement given by the defendant while he was unlawfully confined. 312 Minn. 1, 9, 250 N.W.2d 590, 595 (1977). We noted in *Weekes* that a statement made after an illegal arrest and confinement is nonetheless admissible if proved to be " 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " 312 Minn. at 7, 250 N.W.2d at 594 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Concluding that the record on appeal in *Weekes* was inadequate to rule on whether "there was sufficient attenuation of the taint" in Weekes' case, we remanded for "such further evidentiary hearings as may be necessary to determine the admissibility of [the] statement" under the numerous factors set forth in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *Weekes*, 312 Minn. at 3, 9–10, 250 N.W.2d at 592, 595.

Similarly, in *State v. Fageroos*, the defendant urged us to award him a new trial because the district court closed the courtroom during the testimony of two minor victims without making the requisite factual findings. 531 N.W.2d 199, 200 (Minn. 1995). We concluded that the automatic grant of a new trial was not appropriate, stating:

> [T]he remedy should be appropriate to the violation. If a remand for a hearing on whether there was a specific basis for closure might remedy the violation of closing the trial without an adequate showing of the need for closure, then the initial remedy is a remand, not a retrial. * * * We believe that the [state] should be given an opportunity to establish, if [it] can, that closure was necessary. If the [state] is unable to do so, then defendant is entitled to a new trial.

*Id.* at 203 (citation omitted).

More recently we reached a similar conclusion in *Licari*. 659 N.W.2d 243. In that case, the defendant challenged the admissibility of much of the evidence used to convict him on the grounds that police improperly seized the evidence without a warrant. *Id.* at 246. Although the state had not argued to the district court that the evidence would have inevitably been discovered by lawful means—thus allowing the evidence to be admitted under the inevitable discovery exception to the warrant requirement—we remanded the case for further development of the factual record on inevitable discovery and one other issue. *Id.* at 254–56. We concluded that such a remand was necessary in the "interests of justice," notwithstanding our holding in *Garza v. State* that the state may waive "an argument that would otherwise support an order denying a motion to suppress evidence if the argument requires a factual record and the state failed to develop that record at the omnibus hearing." *Licari*, 659 N.W.2d at 255–56 (citing *Garza*, 632 N.W.2d 633, 637 (Minn.2001)). Factors supporting our decision to remand in the interests of justice included "legal issues suggested by [the] record but not addressed by the district court, the gravity of the offense charged, and the reversal of

the grounds previously relied upon by the district court and the court of appeals to defeat appellant's motion to suppress." *Id.* at 256.

■■■■■ The foregoing case law supports a conclusion that remanding for an evidentiary hearing on forfeiture does not violate Wright's due process rights. It could nonetheless be argued that the state waived its opportunity to develop a further factual record on this issue by not attempting to prove forfeiture in district court, but we conclude that this argument is unpersuasive in light of *Licari.* At the time of Wright's trial, neither *Crawford* nor *Davis/Hammon* had been decided, and *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), set the standard for determining which out-of-court statements were admissible in light of the Confrontation Clause. *See Crawford,* 541 U.S. at 40, 124 S.Ct. 1354. Under *Roberts,* the state needed only to convince the district court that the out-of-court statements of R.R. and her sister had "adequate indicia of reliability"—that is, that they fell "within a 'firmly rooted hearsay exception' or [bore] 'particularized guarantees of trustworthiness.'" *See id.* at 42, 124 S.Ct. 1354 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531).

The state had a strong argument that the statements R.R. and her sister made to the 911 operator and to police were admissible under *Roberts* as "excited utterances," and the district court agreed, citing, among other cases, *State v. Gates,* 615 N.W.2d 331 (Minn.2000). In *Gates,* we stated that "[T]he excited utterance excep-

tion is firmly rooted for purposes of Confrontation Clause analysis.". *Id.* at 336–37.[9] Accordingly, there was no apparent need for the state to establish a factual record on forfeiture. *See Wright II,* 701 N.W.2d at 815 ("A forfeiture * * * analysis was unnecessary at the time of Wright's trial because the Supreme Court had not yet issued its decision in *Crawford*."). *See also Davis/Hammon,* 126 S.Ct. at 2280 ("The *Roberts* approach to the Confrontation Clause undoubtedly made recourse to [the forfeiture] doctrine less necessary, because prosecutors could show the 'reliability' of *ex parte* statements more easily than they could show the defendant's procurement of the witness's absence."). Given the circumstances of this case and in particular, the state of the law interpreting the Confrontation Clause at the time of Wright's trial, we hold that the state has not waived the opportunity to present additional evidence to further develop a factual record on forfeiture.

On remand, the state should be given an opportunity to establish, by a preponderance of the evidence, that Wright forfeited his confrontation claim (1) by engaging in wrongful conduct; (2) with the intent to procure the unavailability of R.R. and her sister; and (3) that his wrongful conduct actually did procure their unavailability. *See Fields,* 679 N.W.2d at 347. If the state is unable to prove that forfeiture occurred, then Wright is entitled to a new trial that does not include the on-scene statements R.R. and her sister made to the police.

9. With regard to the 911 tape, the court stated, "I have listened over the many years that I have been a judge to a lot of 911 tapes, and this is about as much in the category of excited utterance[s while] still be[ing] coherent as I have heard." As to the on-scene statements R.R. and her sister made to police, the court stated, "[T]he statements [were] made quite soon after the incident. * * * [B]oth [witnesses] were testifying while still * * * under the influence [of what happened to them], still tearful, crying, very upset, had difficulty calming * * * down, were still quite frightened, and I believe that those were excited utterances * * *."

Remanded for further proceedings consistent with this opinion.