THISSEN, Justice.
Appellant Michael Paul Valentine Jaros challenges his conviction of first-degree criminal sexual conduct and false imprisonment, arguing that he was deprived of a fair trial when a detective improperly testified about photographs that were found on Jaros's cellphone. The district court denied Jaros's motion for a mistrial after the detective's testimony. We affirm.
FACTS
On June 11, 2016, T.H. attended a street dance in Fergus Falls. T.H. was sitting at a picnic table with T.F., whom she had met the previous night, when appellant Michael Jaros and his girlfriend Stephanie Holding-Eagle came to sit by them. The four people talked and drank together.
At about 10:45 p.m., the group drove to another bar. T.H. drank only water at the second bar because she had already had several drinks. Jaros and T.H. flirted with each other while at the bar. When Jaros and Holding-Eagle went outside to smoke, people at the bar told T.H. that Jaros and Holding-Eagle were married.
T.H. went outside to ask Jaros and Holding-Eagle what was going on. Jaros and Holding-Eagle denied that they were a couple, but T.H. wanted to leave the bar, so she climbed over the deck. In doing so, she scraped her leg. She sat in the parking lot and began to cry.
T.F. came outside. He told T.H. that he had "a weird vibe" from Jaros and Holding-Eagle.[1] Jaros and Holding-Eagle came over to T.H. and told her to come back to Jaros's house. T.H. agreed.
T.H. and Jaros arrived at Jaros's house around 12:30 a.m. after picking up T.H.'s car from the first bar. Holding-Eagle arrived shortly after them. The three had drinks and played a game. After an hour and a half, T.H. began to get tired and said she wanted to go home. Jaros and Holding-Eagle told her that she had had too much to drink and should not drive.
*468 T.H. lay down on the couch. Holding-Eagle came over to her and started rubbing her crotch against T.H.'s leg. T.H. told her to stop, but Holding-Eagle did not listen and continued, trying to get under T.H.'s blanket. T.H. yelled out to Jaros, "Mike, come get her off of me." T.H. was facing toward the back of the couch on her side and Jaros, who had taken off all of his clothes except his boxers, lay behind her and started pushing up against her. T.H. told him to get off of her, saying that she did not like what he was doing and just wanted to sleep.
Jaros sat up and Holding-Eagle pulled his penis out of his boxers. She tried to get T.H. to look, saying, "Look at it. Isn't it big?" T.H. told her she did not want to look at it and said, "Get off of me. I just want to leave." At that point, Holding-Eagle said to Jaros, "Okay, let's just leave her alone," and Jaros and Holding-Eagle went outside to smoke by the front door. While they were outside, T.H. went out the side door, got in her car, and left.
T.H. went back, however, because she had forgotten her phone. When she arrived, she saw Holding-Eagle outside. Holding-Eagle told T.H. that T.H. had upset Jaros. T.H. went inside to get her phone and Jaros came to the room and sat on the couch. Holding-Eagle followed T.H. inside and stood by the door.
T.H. told Jaros that she was sorry and did not mean to upset him but that she just wanted her phone and then wanted to go home. Jaros responded, "Well, now you've got to make it up to me." When T.H. moved to leave, Jaros grabbed her by the arm and "slammed" her onto the couch. T.H. told Jaros to get off of her and said she was going to call the police. Jaros slapped T.H. and told her not to talk to him like that. He began to pull off T.H.'s jeans and underwear as she tried to kick him and push him off of her. T.H. asked Holding-Eagle to get Jaros off of her. Holding-Eagle replied that T.H. should not have made Jaros angry.
After pulling off T.H.'s jeans and underwear, Jaros raped her by penetrating her vagina. She repeatedly told him to stop and told him it hurt, but he just said, "[Y]ou shouldn't have pissed me off." Holding-Eagle watched Jaros rape T.H., and told him, "Don't choke her too much because we don't want her passing out." Whenever T.H. told Jaros that he was hurting her, he would reply, "After every sentence you say, you need to say 'sir.' " Then he told Holding-Eagle to give oral sex to T.H. After Holding-Eagle gave oral sex to T.H., Jaros penetrated T.H.'s vagina again. She began to bleed and Jaros asked if she was on her period. T.H. responded that she was not and that she was probably bleeding because he was hurting her. Jaros slapped her again, and said, "Don't lie to me." T.H. said Jaros raped her "again and again" and then pulled off the rest of her clothes and made her go to his bedroom. Jaros then put T.H. down onto the bed and got on top of her. He penetrated her vagina again. She told him again to stop and that he was hurting her.
Jaros raped T.H. between 2 and 2½ hours. Eventually, Jaros stopped. He got up and told her that she could go. Before she left, T.H. grabbed a piece of his mail from a table.
T.H. drove straight to the hospital. She spoke to Detective Shirkey of the Fergus Falls Police Department at the hospital and told him what had happened. Detective Shirkey took photographs of bruises on T.H.'s arms, legs, and neck. T.H. also identified pictures of Jaros and Holding-Eagle in photographic lineups.
A doctor then examined T.H. As he did so, T.H. bled on her hospital gown and sheets. A nurse took additional pictures of *469 T.H.'s injuries during the examination and took vaginal, rectal, and skin swabs to be sent to the Minnesota Bureau of Criminal Apprehension (BCA). The nurse testified that, during the intake process, T.H. provided specifics about the assault.
The doctor and nurse observed bruising on T.H.'s outer thigh, arms and wrists, neck, and ankles. They also observed internal vaginal bleeding from a "fresh" vaginal tear and dried blood on her perineum area. The doctor further observed a fresh tear that was about one centimeter in length on the back wall of T.H.'s vagina and an abrasion on the side wall of T.H.'s vagina. He noted that it was uncommon to see injuries inside the vagina, so he took pictures to document those injuries.
A witness from the BCA testified that the BCA serologist found seminal fluid on the swabs submitted by the hospital. The BCA witness took a sperm cell fraction of the perineal swabs that had a mixture of more than one person's DNA and found that, while Holding-Eagle's DNA could be excluded from the mixture, Jaros's and T.H.'s DNA could not be excluded as a source of the mixture.
After speaking with T.H. at the hospital, Detective Shirkey obtained a search warrant for Jaros's home. Jaros and Holding-Eagle were in the residence at the time of the search and they were both arrested. On the same day, Detective Shirkey met with Jaros at the Otter Tail County Detention Facility. During the interview, Jaros denied that he had any sexual contact or sexual intercourse with T.H. the previous night.
Detective Shirkey conducted a "Cellebrite" analysis of the cellphones seized at the residence. He explained at trial that "[t]he Cellebrite machine is a forensic computer that extracts all of the data within a cellular phone, or a tablet, or a GPS unit.... And pulls it into the program on the computer where it's more easily viewable as a report." Detective Shirkey was not able to access Holding-Eagle's phone, but he analyzed Jaros's phone. Although Detective Shirkey did not find anything on Jaros's phone related to T.H. or the assault she reported, he found a number of pornographic images.
Jaros testified at trial that when he met T.H. at the bar, she told them about a man she had met the previous night who had tried to drag her out of a bar. She rolled up her sleeve and showed bruises all over her arm. Jaros testified that after T.H. climbed over the side of the bar deck, he went over to see if she was okay and they kissed.
Jaros testified that when T.H. came back to his house for her phone later in the night, they had sex. Jaros insisted that it was consensual and that T.H. stated that she wanted to have sex and did not tell him "no" at any point. When Jaros referred to Holding-Eagle as his girlfriend, however, T.H. grew angry and stopped having sex. She looked at Jaros and said, "I'm going to come back here and shoot you in the f* * *ing face."
Detective Shirkey also testified at trial. Among other things-and central to this appeal-Detective Shirkey described in detail photographs he had found on Jaros's cellphone. His exchange with the prosecuting attorney follows:
Q. What, if anything, did you find or that you noted in the [cellphone] report significant to this case?
A. There were a number of photographs that were located within the report, and I did confirm by physically looking through the phone as well that the photographs and the report were an accurate depiction of what was on the phone; and I did find numerous pornographic images that showed violence towards *470 women or violent acts of a sexual nature occurring, some of which corroborated [T.H.'s] story about what had happened.
Q. And did you do a report in that regard and make those notations for that reason?
A. Yes.
Q. And you don't need to go into great detail, but just in a general sense, what did you note that corroborated; what were you looking for in that regard to these images?
A. There were images that-images oftentimes have captions with them. The captions were dialogue that were put onto the photos. As I said, showed either a dominance or a violence towards women, speaking angrily, being in a dominant position over them.
Q. And when you say that, what does that mean to some of us that may not know; how would-where would the male be versus the female, things of that nature; and were there more than two people involved?
A. It was corroborating [T.H.'s] statement about being told to call Mike "sir." There were a number of photos that talked about a male having sex with a female and then it being another female's job to clean things up afterwards. Which corroborated the penile vaginal intercourse and then Miss Holding-Eagle performing oral sex on her at a later time.
Q. And what, if anything, else significant in any of the photographs you viewed?
A. I guess I'd have to have a more specific question to know what else.
Q. But in a general sense that's kind of the notations you made and then just was looking for things that were noteworthy to you because of [T.H.]; is that what you're saying?
A. Correct.
Jaros's counsel did not object to the testimony.
After Detective Shirkey's direct testimony concluded and the jury was in recess, Jaros's counsel reported that the defense did not receive the report on the Cellebrite analysis that Detective Shirkey discussed during his testimony. Jaros moved for a mistrial based on the failure of the State to disclose Detective Shirkey's cellphone report, arguing that the State's nondisclosure deprived Jaros of an opportunity to prepare for testimony on the report. Jaros also argued that the evidence was prejudicial and should not have been admitted. The State admitted that it did not provide Detective Shirkey's report to the defense but noted that Jaros had the Cellebrite information and the photographs and videos upon which Detective Shirkey's report was based.
After viewing Detective Shirkey's report and reviewing the transcript from his testimony, the district court denied the motion for mistrial. The district court reasoned that "[t]he basis [for the denial] is going to be the standard for mistrial is manifest necessity due to an error that has occurred that is so significant or serious that it cannot be cured with an intervention less drastic than granting the mistrial." The court found that the failure to disclose the Cellebrite analysis did not meet that threshold.
The district court also expressed concern that Detective Shirkey's testimony included opinions offered by a nonexpert and was improper character evidence. The court decided to instruct the jury to ignore Detective Shirkey's opinion testimony because Detective Shirkey was not qualified as an expert and to disregard Detective Shirkey's testimony suggesting that a person who had the pornographic photographs that Jaros had on his phone was more likely to rape T.H. Jaros did not *471 object to the instructions. The court also told the State to refrain from referring to the photographs or Detective Shirkey's opinion testimony.
Following the recess, the judge instructed the jury:
We are about to continue with Detective Shirkey's testimony. Before we do that, ladies and gentlemen, I have a couple of additional instructions to read to you.
You have heard testimony concerning the opinion of Detective Shirkey and the basis for that opinion. Detective Shirkey has not been qualified as an expert, and the basis of that opinion is not evidence in this trial. You should ignore that testimony.
You may have heard evidence in the form of testimony about photographs that purports to speak to the character of the defendants. You may not consider any such evidence as bearing on whether the defendants acted in conformity with that character on any particular occasion.
During a later cross-examination of Holding-Eagle, the prosecutor referenced Detective Shirkey's testimony by asking Holding-Eagle: "And he's holding your head, telling you to perform oral sex? ... So he's telling you what to do; he's telling you to clean up, that kind of thing ...?" The defense did not object to this line of questioning.
Following the close of evidence, the district court gave the jury the following instruction:
During this trial I may have told you to disregard certain evidence. If I have told you to disregard something you have already seen or heard, you must do so. It is not a proper part of the case, and you cannot fairly consider it as such.
You might wonder how you can disregard something you have already heard. Here is a way to do it: at the end of trial, back in the jury room, you will likely review all of the evidence in the case. From that evidence alone you will decide upon a verdict. Anything I have told you to disregard will simply not be included in the evidence upon which you base your verdict. It will not be part of your discussions, and you will not use it in any way. In that sense, you will have disregarded the item.
During deliberations, the jury submitted a question to the district court: "What from Detective Shirkey or his testimony are we not to take into consideration?" The court responded, "Detective Shirkey testified to conclusions he drew from viewing images on Mr. Jaros's phone. These images were not entered into evidence, and you should disregard any conclusion he expressed based on viewing them." Jaros did not object to the court's answer.
The jury found Jaros guilty of two counts of criminal sexual conduct in the first degree and one count of false imprisonment. The court sentenced Jaros to 144 months for the first count of criminal sexual conduct and, concurrently, 15 months for the false-imprisonment count.
Jaros appealed to the court of appeals. The court of appeals affirmed. State v. Jaros , No. A18-0039, 2018 WL 5915421 (Minn. App. Nov. 13, 2018). We granted Jaros's petition for review.
ANALYSIS
On appeal to our court, Jaros argues that he was deprived of a fair trial because Detective Shirkey improperly testified and offered opinions about the photographs on Jaros's cellphone. Our review is for an abuse of discretion by the district court. State v. Bahtuoh , 840 N.W.2d 804, 819 (Minn. 2013) (stating that denial of a *472 motion for a mistrial is reviewed for an abuse of discretion because "the district court is in the best position to evaluate the prejudicial impact, if any, of an event occurring during the trial."); see State v. Vasquez , 912 N.W.2d 642, 648 (Minn. 2018) (reviewing the district court's admission of evidence for an abuse of discretion). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." State v. Guzman , 892 N.W.2d 801, 810 (Minn. 2017).
I.
There is no real dispute that Detective Shirkey's opinion testimony concerning the pornographic images on Jaros's cellphone should not have been admitted and was prejudicial to Jaros. The district court found as much and the State does not argue otherwise.[2]
But the fact that the jury heard inadmissible testimony does not end our inquiry. We generally will not reverse a verdict even when improper testimony is presented to the jury unless there is a "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." State v. Matthews , 800 N.W.2d 629, 633 (Minn. 2011) (articulating the harmless-error test) (citation omitted) (internal quotation marks omitted); see also State v. Manthey , 711 N.W.2d 498, 506 (Minn. 2006) (finding that there was no abuse of discretion by district court's refusal to grant a mistrial because there was no reasonable probability that the outcome of the trial would have been different if the event that prompted the motion had not occurred). The burden rests on Jaros to establish a reasonable possibility that the jury would have reached a different verdict had the wrongfully admitted testimony not come in. State v. Holliday , 745 N.W.2d 556, 568 (Minn. 2008).[3]
Jaros urges us to apply a different test when assessing whether the wrongful admission of Detective Shirkey's opinion testimony requires a new trial. Jaros points us to State v. Cox , 322 N.W.2d 555 (Minn. 1982), and asserts that the State bears the burden of proving that Detective Shirkey's opinion testimony was not prejudicial.
In Cox , a sheriff commented during trial within earshot of several jurors that "[a]s far as I am concerned it is all over [when the prosecution rests], but I am prejudiced." Id. at 557-58. After interviewing the jurors who heard the remark and instructing them to disregard the sheriff's comment, the district court proceeded with the trial. On appeal, we stated that "[s]tatements of a court official about the merits of a criminal case raise a rebuttable presumption of prejudice." Id. at 558. As we recognized in Cox , "[t]he exposure of a jury to potentially prejudicial material creates a problem of constitutional magnitude, because it deprives a defendant of the right to an impartial jury and the right to confront and cross-examine the source of the material." Id.
*473 We disagree with Jaros that the standard articulated in Cox applies here. Jaros does not contend that the jury was exposed to potentially prejudicial material outside of the trial process, and he has identified no other error of constitutional magnitude in the admission of Detective Shirkey's opinion testimony. Jaros properly does not argue that the admission of Detective Shirkey's testimony violated his Sixth Amendment confrontation right or right to an impartial jury. Unlike the sheriff in Cox , Detective Shirkey was on the stand and subject to cross-examination. Indeed, Jaros's lawyer cross-examined Detective Shirkey. Further, the essence of a violation of a person's Sixth Amendment right to an impartial jury is that the jury is affected by information or interference outside the ordinary course of the trial (e.g., the bias of a particular juror, adverse publicity, statements by nonwitnesses). See, e.g. , State v. Hallmark , 927 N.W.2d 281, 300 (Minn. 2019) (stating that a defendant who asserted a claim of juror bias based on exposure to "the case through the internet, newspapers, and television media," must "demonstrate that at least one juror was 'actually biased' against him ...." (quoting State v. Curtis , 905 N.W.2d 609, 614 (Minn. 2018) )); Curtis , 905 N.W.2d at 614-15 (acknowledging the constitutional right to an impartial jury, stating that a court "commits structural error when it allows actually biased jurors to sit," and requiring the party asserting the claim of actual bias to "show that the juror had 'strong and deep impressions' that she could not set aside, thus preventing her from rendering a verdict based on the evidence presented in court." (quoting State v. Fraga , 864 N.W.2d 615, 623 (Minn. 2015) )). Such outside interference is not what occurred here.
Jaros instead attempts to fashion a due process violation by asserting that Detective Shirkey's opinion evidence is so prejudicial that the simple fact that the jury heard it meant there was no way Jaros could get a fair trial. But we have never broadly held that the admission of prejudicial evidence, standing alone, so taints the trial that it transforms an evidentiary error into a constitutional error.[4] Such an approach would swallow the harmless-error rule by turning every evidentiary error into constitutional error. In fact, we rejected a similar argument in Fraga , 898 N.W.2d at 273 n.4 (rejecting an argument that because our " 'general exclusionary rule is grounded in the defendant's constitutional right to a fair trial,' " we are required to apply a constitutional test to the erroneous admission of prior bad acts evidence (quoting State v. Fardan , 773 N.W.2d 303, 315 (Minn. 2009) )); see also Fardan , 773 N.W.2d at 320 n.9 (stating that we are not required to apply "the surely unattributable test to an erroneous admission of Spriegl evidence that does not involve a constitutional error"); State v. Ness , 707 N.W.2d 676, 691 (Minn. 2006) ("When the district court has erroneously admitted other-acts evidence, this court must determine whether there is a reasonable possibility that the wrongfully admitted *474 evidence significantly affected the verdict.").
We therefore conclude that the State does not bear the burden to prove that an error in admitting Detective Shirkey's testimony was harmless beyond a reasonable doubt.
II.
Having decided that the Cox standard does not apply, we now turn to the question of whether Jaros established that there is a reasonable possibility that Detective Shirkey's opinion testimony significantly affected the verdict. See Matthews , 800 N.W.2d at 633 ; see also Manthey , 711 N.W.2d at 506.[5] To do so, we examine the entire record. State v. Bolte , 530 N.W.2d 191, 198 (Minn. 1995). "[I]f there is a reasonable possibility that the verdict might have been more favorable to the defendant if the evidence had not been admitted, then the error in admitting the evidence was prejudicial error." State v. Post , 512 N.W.2d 99, 102 n.2 (Minn. 1994) ; see also Ness , 707 N.W.2d at 691 (conducting a reasonable possibility analysis of the erroneous admission of bad-acts evidence and holding that there was no prejudice because the evidence merely "bolstered" the finding of guilt and "was not the critical push beyond a reasonable doubt"). "When determining whether evidence significantly affected the verdict, we consider 'whether the State presented other evidence on the issue,' " as well as whether the district court issued cautionary instructions. State v. Benton , 858 N.W.2d 535, 541 (Minn. 2015) (quoting State v. Riddley , 776 N.W.2d 419, 428 (Minn. 2009) ). We also consider whether the State relied on the inadmissible evidence to make its case during its closing argument. State v. Thao , 875 N.W.2d 834, 839 (Minn. 2016) ("When determining whether the admission of prior-bad-acts evidence is harmful, we have considered ... 'whether the State dwelled on the evidence in closing argument ....' " (quoting Riddley , 776 N.W.2d at 428 )).
We hold that Jaros did not carry his burden. In coming to this conclusion, we acknowledge that the conduct of the prosecutor is troubling. In response to the prosecutor's questions, Detective Shirkey testified about pornographic images that were not admitted as evidence. Detective Shirkey based his testimony on a report he prepared, which the prosecutor failed to disclose to Jaros. Detective Shirkey expressed opinions about the images that he was not qualified to express. As the district court stated, his testimony was inadmissible character evidence suggesting to the jury that Jaros had a general propensity for violence toward women. Moreover, the prosecutor referred to Detective Shirkey's report later in the trial despite the district court's express command not to do so.
We also observe that Detective Shirkey expressly testified that his analysis of the *475 unadmitted images "corroborated [T.H.'s] story about what happened." He opined that the photographs corroborated "[T.H.]'s statement about being told to call [Jaros] 'sir.' " Detective Shirkey also opined that the images corroborated T.H.'s testimony that Jaros said it is a female's job to "clean things up afterwards."
Detective Shirkey's corroboration of parts of T.H.'s testimony and his suggestion that Jaros acted in conformity with his general propensity for violence toward women, however, is outweighed by strong evidence supporting T.H.'s testimony at trial and pointing to Jaros's guilt. See Griffin , 887 N.W.2d at 262 & n.3 (upholding a verdict where the evidence presented by the State on the contested element was considerable); Ness , 707 N.W.2d at 691 (upholding a guilty verdict despite impermissible evidence that "bolstered" a conclusion that the defendant acted with sexual or aggressive intent when other evidence existed to support the same conclusion).
T.H.'s description of the night Jaros sexually assaulted her was detailed, clear, and consistent from her first report of the assault to the hospital nurse on the morning following the assault through her trial testimony. The nurse and doctor who treated her for the assault corroborated T.H.'s testimony. The nurse and doctor also testified that T.H.'s injuries were consistent with the sexual assault that T.H. reported.[6] In fact, the injuries were unusual enough that the doctor could recall seeing only two other injuries as severe as T.H.'s over the course of his career. Because they were so uncommon, the doctor ordered photographs of the injuries, which he had never done before. Physical evidence like the blood stains on the couch is consistent with T.H.'s description of events. Finally, the fact that Jaros initially lied to the police, saying that he and T.H. did not have sex, lends support to the jury's verdict.
To prove its case to the jury, the State relied heavily on the testimony of T.H. and the medical professionals, not on Detective Shirkey's opinion testimony. Furthermore, the State never referred to Detective Shirkey's opinion testimony during closing argument. See Thao , 875 N.W.2d at 839.
Finally, with Jaros's acquiescence, the district court twice instructed the jury to disregard Detective Shirkey's testimony during trial: the first time was shortly after Detective Shirkey's testimony, and the second time was at the close of evidence (in more general language). During deliberations, the jury asked for clarification on what parts of Detective Shirkey's testimony it could consider, and the district court told the jury to disregard Detective Shirkey's opinion testimony about the unadmitted photographs. Under the circumstances of this case, we conclude that the district court's cautionary instructions to the jury mitigated the impact of the wrongfully admitted evidence. See id. , 875 N.W.2d at 839 ; State v. Mahkuk , 736 N.W.2d 675, 689 (Minn. 2007) (concluding that the issuance of curative instructions rather than granting a mistrial was a proper use of discretion).
Having carefully reviewed the entire record, we hold that no reasonable possibility exists that the erroneously admitted evidence significantly affected the outcome of the trial. The district court therefore did *476 not abuse its discretion by denying Jaros's mistrial motion.
CONCLUSION
For the foregoing reasons, we affirm the judgment of conviction.
Affirmed.

T.F. testified that once he got home, he called 911 because he thought "something just don't seem right." An officer came out to T.F.'s home and he told the officer that he had met some people and something seemed off about them, but T.F. did not remember any of their names. Because T.F.'s information was vague, the officers were not able to follow up on his call.

Jaros initially sought a mistrial for two reasons: the nondisclosure of Detective Shirkey's report and the admission of Detective Shirkey's opinion testimony. Jaros does not argue on appeal that the district court erred by denying his motion for mistrial on the basis of the nondisclosure of Detective Shirkey's report or that the discovery violation requires a new trial. Jaros also does not make a prosecutorial-misconduct argument on appeal.

Although Jaros did not immediately object to the admission of Detective Shirkey's testimony, he sought a mistrial during the recess that followed the State's direct examination of Detective Shirkey. The State does not contend that a plain-error-review standard applies here.

In the context of mistrial motions involving in-court testimony or the admission of evidence, we have required that defendants bear the burden of proving harm, rather than requiring the State to disprove harm. See, e.g. , State v. Griffin , 887 N.W.2d 257, 262-63 (Minn. 2016) (affirming the denial of a mistrial motion based on an improper question by prosecutor); Bahtuoh , 840 N.W.2d at 819-20 (affirming the denial of a mistrial motion based on grand-jury testimony being read into the record); State v. Spann , 574 N.W.2d 47, 53 (Minn. 1998) (affirming the denial of a mistrial motion based on the prosecution's failure to disclose newly discovered oral statements before questioning a witness about them).

The district court applied a "manifest necessity" standard when it denied Jaros's mistrial motion. Under this standard, a "high degree of necessity-not absolute necessity-must exist before a mistrial is appropriate." State v. Long , 562 N.W.2d 292, 296 (Minn. 1997). The manifest-necessity standard is used only "when a mistrial is declared without the defendant's consent. " Id. (emphasis added). Here, of course, Jaros was seeking the mistrial. We conclude, however, that the district court's use of the manifest-necessity standard does not affect the outcome on appeal. We have held that even if a district court applies the wrong legal standard, if the ruling was warranted under the proper standard and no prejudice results, reversal is not required. State v. Fox , 868 N.W.2d 206, 215, n.1 (Minn. 2015). As our analysis below sets forth, there is not a reasonable probability that the outcome of the trial would have been different had Detective Shirkey's testimony not included his opinions on the pornographic images.

Although Jaros focuses here, as he did at trial, on an argument that T.H.'s injuries occurred not because he used force against T.H. but because his penis is unusually large, the nurse who testified repeatedly rebutted this argument at trial: "If somebody was girthy, for lack of a better word, [the tear] would probably be more lower in the vaginal entrance versus up within the vaginal vault .... [d]ue to spreading of the vagina."