STATE OF MINNESOTA

IN SUPREME COURT

A22-1104

Court of Appeals
Chutich, J.
Concurring, Hudson, C.J., Thissen, J.
Took no part, Hennesy, J.

State of Minnesota,

        Respondent,

vs.
Filed: July 31, 2024
Office of Appellate Courts

Frank James Bigbear,

        Appellant.

_____

Keith Ellison, Attorney General, Lisa Lodin, Assistant Attorney General, Saint Paul, Minnesota; and

Kimberly J. Maki, Saint Louis County Attorney, Duluth, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Adam Lozeau, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.     Harmless-error review considers whether a reasonable possibility exists that the error significantly influenced the verdict, not merely whether the other properly admitted evidence was sufficient to support the verdict.

1

2.     The erroneous admission of the recorded interview was harmless because no reasonable possibility exists that the evidence significantly affected the jury's verdict.

Affirmed.

O P I N I O N

CHUTICH, Justice.

The issue in this case is whether the court of appeals conducted an incorrect harmless-error analysis to assess the impact of erroneously admitted evidence when it affirmed appellant Frank James Bigbear's conviction for third-degree criminal sexual conduct.  If we conclude that the analysis was incorrect, we must also decide whether the error was harmless after conducting the correct standard of review.  Bigbear, who was in his thirties, was charged with third-degree criminal sexual conduct for sexually assaulting I.M., who was then 14 years old.  At trial, respondent State of Minnesota presented four witnesses, including the victim, and submitted more than 10 exhibits.  Over Bigbear's hearsay objection, the State introduced a video recording of the victim's interview with an investigator and a social worker that was conducted shortly after the sexual assault.  After a 3-day trial, the jury found Bigbear guilty.

Bigbear appealed, arguing that the admission of the recorded interview was reversible error.  The court of appeals agreed that the video recording did not satisfy Rules 801(d)(1)(B) and 807 of the Minnesota Rules of Evidence.  *State v. Bigbear*, No. A22-1104, 2023 WL 4169982, at \*3–5 (Minn. App. June 26, 2023).  Nonetheless, the court of appeals concluded that the error was harmless because "the jury could have reached the

same 'verdict based on the other evidence . . . presented.' " *Id.* at \*5–6 (quoting *State v. Blasus*, 445 N.W.2d 535, 540 (Minn. 1989)) (omission in original).

Bigbear now argues that the analysis of the court of appeals was flawed because the court conducted an improper harmless-error review. Specifically, Bigbear asserts that the court of appeals erred by focusing solely on whether other properly admitted evidence sufficiently supported the verdict, rather than the correct standard, which is whether the erroneously admitted evidence substantially influenced the jury's decision. He further contends that under the correct standard of review, the admission of the recorded interview was not harmless. We agree that the court of appeals employed an incorrect harmless-error analysis. After conducting the correct harmless-error standard of review, however, we nonetheless affirm the decision of the court of appeals because we conclude that the erroneous admission of the video was harmless.

## FACTS

On September 19, 2019, a mandated reporter contacted the police to report a sexual assault involving I.M, a child, prompting an investigation. When contacted by officers, I.M.'s mother ("Mother") said that there had been an incident between Bigbear and I.M. about 2 weeks earlier. I.M. was then interviewed by an investigator and a social worker, and the interview was recorded. The investigator also separately interviewed Mother and Mother's boyfriend ("Boyfriend") and recorded those sessions. The investigator learned that during the summer of 2019, Mother and Boyfriend witnessed Bigbear, who was then

30 or 31 years old,[1] sexually assaulting I.M., who was then 14 years old, in an apartment in Duluth. The State charged Bigbear with third-degree criminal sexual conduct. Minn. Stat. § 609.344, subd. 1(b) (2020) (criminalizing the sexual penetration of a child between the ages of 13 and 16 when the perpetrator is more than 24 months older than the victim).

The State presented the testimony of I.M., Mother, Boyfriend, and the investigator at trial, as well as the video recordings of the investigator's interviews with them. I.M., who was 16 years old when the trial occurred in December 2021, testified that Bigbear had sexual intercourse with her in an apartment where Mother and Boyfriend lived sometime before the fall of 2019. I.M. testified that Bigbear was at the apartment to hang out with a friend of Boyfriend. I.M. and Bigbear went into a bedroom where they made out and had sexual intercourse, which I.M. explained meant that his penis went inside her body. She testified that she was not wearing any pants or underwear and that Bigbear was naked. Mother and Boyfriend interrupted Bigbear having sex with I.M., and they kicked Bigbear out of the apartment. I.M. testified that she and Bigbear had not talked about sex beforehand. At trial, she admitted that she had not been honest during the interview with the investigator but stated that she was being truthful in her trial testimony. I.M. did not identify which parts of the interview were not truthful. She also admitted on cross-examination that she had lied to Bigbear, telling him that she was 18 years old.[2]

---

[1] At the beginning of the summer of 2019, Bigbear was 30 years old; he turned 31 on August 1, 2019.

[2] Because it is undisputed that Bigbear is more than 120 months older than I.M., neither mistake of age nor consent is a defense to the charge. Minn. Stat. 609.344, subd. 1(b) ("In any such case if the actor is no more than 120 months older than the

4

Mother and Boyfriend testified at trial. They each identified Bigbear as the person they saw having sex with I.M. Each testified that they saw Bigbear on top of I.M., moving up and down under a blanket. When Mother and Boyfriend confronted him, they saw that he was naked. Bigbear said that he thought I.M. was 18. Boyfriend then punched Bigbear, and they threw him out of the apartment. The recorded video interviews of Mother and Boyfriend with the investigator were also introduced at trial without objection and were not challenged on appeal. Boyfriend's recorded interview included an additional detail not in his trial testimony: While he was punching Bigbear after discovering him having sex with I.M., Bigbear said, "I deserve it. I deserve it."

Over defense counsel's hearsay objection, the court also admitted a 33-minute video recording of the September 26, 2019 interview of I.M. by the investigator and a social worker. Although defense counsel objected to the admission of the video recording, he did not ask for specific redactions of any portion of the video. The video was introduced during the investigator's testimony as a prior consistent statement by I.M., Minn. R. Evid. 801(d)(1)(B),[3] and under the residual hearsay exception, Minn. R. Evid. 807.[4]

---

complainant, it shall be an affirmative defense . . . that the actor reasonably believes the complainant to be 16 years of age or older. In all other cases, *mistake as to the complainant's age shall not be a defense. Consent by the complainant is not a defense . . . .*" (emphasis added)).

[3] "A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and helpful to the trier of fact in evaluating the declarant's credibility as a witness." Minn. R. Evid. 801(d)(1)(B).

[4] A hearsay statement that is not "specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness," is not prohibited by the hearsay

In the recorded interview, I.M. recounted what happened. Like her trial testimony, she identified Bigbear as the person who had sexual intercourse with her at the apartment in Duluth. Consistent with her testimony, I.M. said that "sexual intercourse" meant Bigbear's penis went inside her body, and she described that she was not wearing any pants or underwear and that Bigbear was naked. Like her testimony at trial, she said Mother and Boyfriend interrupted Bigbear having sex with her and that Boyfriend punched Bigbear.

Additionally, in her recorded interview, I.M. described what happened in more detail than in her trial testimony and gave additional information that was either not part of her trial testimony or inconsistent with that testimony. For instance, I.M. described when the sexual assault occurred with more specificity. I.M. also identified Bigbear in the recorded interview by showing the investigator a photo taken from Bigbear's Facebook profile. She explained that she and Bigbear joked about sex, and that he said he wanted to have sex with her before they went into the bedroom. In her recorded interview, I.M. also called Bigbear a "pedophile" and a "pervert" and said that what happened was "gross" and "nasty." I.M. also told the investigator that she got chlamydia[5] from Bigbear; she did not testify about chlamydia at trial. On cross-examination at trial, the investigator testified that he never saw a chlamydia diagnosis and a sexual examination of I.M. was never conducted.

---

exclusion rule, if "the statement is offered as evidence of a material fact," "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," and "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." Minn. R. Evid. 807.

[5] Chlamydia is a sexually transmitted disease. *Chlamydia*, *The American Heritage Dictionary* 326 (5th ed. 2011).

6

Bigbear testified in his own defense. He admitted that he was at the Duluth apartment belonging to Boyfriend and Mother during the summertime in 2019 when he was either 30 or 31 years old. He denied meeting Mother or I.M. and said that he did not know I.M. was there. Bigbear testified that he did not have sexual contact with I.M. and claimed that he remembered the whole day, despite smoking marijuana and drinking that day. He admitted lying down in a bedroom because of his intoxication and testified that he woke up to Boyfriend screaming at him. Bigbear testified that he believed he was being yelled at because he had fallen asleep in the apartment without permission. He denied ever receiving a chlamydia diagnosis.

The jury found Bigbear guilty of third-degree criminal sexual conduct, and the district court imposed a sentence consistent with the Minnesota Sentencing Guidelines.

On appeal, Bigbear argued that admission of the recorded interview was reversible error. The court of appeals agreed that the recorded interview was inadmissible[6] under Minnesota Rules of Evidence 801(d)(1)(B) and 807 because it contained statements that were inconsistent with or entirely absent from I.M.'s trial testimony and because the Rule 807 factors were not satisfied. *Bigbear*, 2023 WL 4169982, at *3–5. The court nonetheless affirmed the conviction. *Id*. The court of appeals concluded that the error was harmless because "[t]he record contains ample evidence that Bigbear sexually assaulted the victim" and "the jury could have reached the same 'verdict based on the other

---

[6] The court of appeals' conclusion that the evidence was erroneously admitted is not before us on appeal.

7

evidence . . . presented.' " *Id.* at *5–6 (quoting *Blasus*, 445 N.W.2d at 540) (omission in original).

Bigbear petitioned for review, asserting that the court of appeals' harmless-error review was flawed and that the error is not harmless under the correct harmless-error standard of review.

**ANALYSIS**

I.

We "generally will not reverse a verdict even when improper [evidence] is presented to the jury unless there is a 'reasonable possibility that the wrongfully admitted evidence significantly affected the verdict.' " *State v. Jaros*, 932 N.W.2d 466, 472 (Minn. 2019) (citation omitted). The defendant bears the burden of making that showing. *State v. Smith*, 940 N.W.2d 497, 505 (Minn. 2020).

When conducting harmless-error review, we "examine the entire record," *Jaros*, 932 N.W.2d at 474, and "cannot focus only on evidence of guilt," *Townsend v. State*, 646 N.W.2d 218, 224 (Minn. 2002). This is because, crucially, "[i]n assessing whether an error is harmless, the question is not whether the [other] evidence was *sufficient* to support the conviction, but rather whether the error substantially influenced the verdict." *State v. Expose*, 872 N.W.2d 252, 260 (Minn. 2015) (emphasis added). An error is not harmless if a reasonable possibility exists that the error significantly affected the jury's verdict. *Smith*, 940 N.W.2d at 505.[7]

---

[7]     Bigbear does not claim that any constitutional right was impacted by the error. In cases in which a constitutional right is involved, "[f]or such a [constitutional] violation to

8

Non-exclusive factors we consider to determine whether a reasonable possibility exists that the erroneously admitted evidence significantly affected the jury's verdict include: "(1) the manner in which the party presented the evidence, (2) whether the evidence was highly persuasive, (3) whether the party who offered the evidence used it in closing argument, and (4) whether the defense effectively countered the evidence." *Smith*, 940 N.W.2d at 505. In addition, "[s]trong evidence of guilt undermines the persuasive value of wrongly admitted evidence." *Id.* This analysis is fact-specific, and not all the factors are relevant or persuasive in every case. *Compare Smith*, 940 N.W.2d at 505 (using the above factors) *with Jaros*, 932 N.W.2d at 474 (considering the State's other evidence on the issue, cautionary instructions, and the State's use of the evidence in closing argument).

When conducting its harmless-error review, the court of appeals did not consider these factors but, instead, only analyzed the sufficiency of the evidence. To be sure, the court began by citing the appropriate harmless-error standard of review. *Bigbear*, 2023 WL 4169982, at *2 ("Under this standard, an appellant who alleges an error must prove that there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict.") (citation omitted) (internal quotation marks omitted).

In its analysis, however, the court quoted *Blasus* for the proposition that "[a]n error is harmless if the jury could have reached the same 'verdict based on the other

---

be deemed harmless, it must be harmless beyond a reasonable doubt." *State v. Courtney*, 696 N.W.2d 73, 79 (Minn. 2005). "An error is harmless beyond a reasonable doubt if the guilty verdict actually rendered was 'surely unattributable' to the error." *Id.* at 80 (quoting *State v. Juarez*, 572 N.W.2d 286, 292 (Minn. 1997)).

evidence . . . presented.' " *Id.* at *5 (omission in original) (quoting *Blasus*, 445 N.W.2d at 540). The court then conducted a sufficiency-of-the-evidence type of review by only reviewing evidence of Bigbear's guilt. *Id.* at *6. The court of appeals concluded that the jury would not have reached a different verdict had the interview been excluded. *Id.*

In short, although the court of appeals initially identified the correct harmless-error standard of review, it incorrectly cited *Blasus* before conducting a sufficiency analysis instead. The parties agree that "sufficient" evidence does not satisfy the harmless-error standard of review.

We have reiterated that *Blasus* does not stand for the proposition that the court of appeals attributed to it. *See, e.g.*, *State v. Koppi*, 798 N.W.2d 358, 365–66 (Minn. 2011) (citing *Blasus*, 445 N.W.2d at 541, in stating that harmless-error review is not about "whether the evidence presented at trial was sufficient to support a jury finding with respect to the element of the offense on which the jury was erroneously instructed"). In *Blasus* itself, we recognized that " '[w]here error may have prejudiced a close factual case, this court will order a new trial, even if the evidence is otherwise sufficient to support the verdict.' " 445 N.W.2d at 541. And we have since clarified that "[i]n assessing whether an error is harmless, the question is not whether the evidence was sufficient to support the conviction, but rather whether the error substantially influenced the verdict." *Expose*, 872 N.W.2d at 260 (stating that *Koppi* stands for the rejection of "the proposition that harmless-error analysis is about assessing the sufficiency of the evidence presented at trial"). Accordingly, the court of appeals conducted an improper harmless-error review.

10

In sum, an error is not harmless merely because other evidence supported the verdict. That inquiry does not sufficiently account for the fact that the jury heard and considered the erroneously admitted evidence. Instead, to assess harmless error we must consider all the evidence introduced as well as other illuminating factors (including the non-exclusive factors set forth earlier) and ask whether there is a reasonable possibility that the error significantly affected the verdict.

## II.

Having identified the correct harmless-error standard of review, we now consider whether there is a "reasonable possibility" that the erroneously admitted recorded interview "significantly affected the verdict." *Jaros*, 932 N.W.2d at 472 (citation omitted) (internal quotation marks omitted). In doing so, we consider the non-exclusive factors we most recently applied in *Smith*: the manner in which the evidence was presented, its persuasive value, its use in closing argument, and Bigbear's counter of the evidence. *See* 940 N.W.2d at 505. We also consider whether the evidence of guilt was strong. *Id.*

At the outset, the parties agree that our harmless-error review should be focused on the inadmissible portions of the video. We agree and, accordingly, in our analysis of each factor, we focus primarily on I.M.'s inconsistent or supplemental statements in the recorded interview because the statements that are consistent with her trial testimony would have been properly admitted.

*Manner Presented*

We consider "the manner in which the party presented the evidence" to determine whether it significantly affected the jury's verdict. *Smith*, 940 N.W.2d at 505. In analyzing

11

the prominence of erroneously admitted evidence, we have previously considered, among other things, the relative number of transcript pages that the evidence occupies. *See id.* at 506 (concluding that inadmissible evidence was only a "small part of the State's presentation" because it spanned only 35 pages of a 1,380-page trial transcript). In addition, we have contemplated whether the evidence was used throughout the State's case. *E.g.*, *State v. Al-Naseer*, 690 N.W.2d 744, 749–50 (Minn. 2005) (concluding that a video recording of the defendant's interview with police was prominent because the prosecutor mentioned it in the State's opening statement, closing argument, and on direct and cross-examination of witnesses to point out inconsistencies in the defendant's statements).

Bigbear argues that the recorded interview featured prominently in the State's case because it was longer than I.M.'s entire trial testimony, as well as the testimony of the other witnesses. The State counters that almost all of the 33-minute interview was admissible as a prior consistent statement, the video in its entirety spanned only 33 pages of the 300-page trial transcript (exclusive of voir dire) and was one of 17 exhibits.

Our review demonstrates that the challenged statements only span about 12 pages of trial transcript.[8] More importantly, the recorded interview was not introduced until I.M., Mother, and Boyfriend had all testified consistently at trial about Bigbear sexually assaulting I.M. The prosecutor did not mention the recorded interview in opening statement and only questioned I.M. and the investigator briefly about it. I.M. admitted that she had not been truthful when speaking to the investigator in 2019. In his direct testimony,

---

[8]    An additional 5 pages of the recorded interview are I.M.'s descriptions of the apartment layout that are not in dispute.

12

the investigator answered questions about his interviewing technique, exhibits created during the interview (a diagram of the apartment and a photo from Bigbear's Facebook profile), and I.M.'s demeanor during the interview. Further, the prosecutor briefly mentioned I.M.'s interview in closing argument primarily to ask the jury to assess whether the girl in the video looked like an adult and to stress the consistency of her statement that sexual penetration occurred. Under these circumstances, we do not believe that the video was given undue prominence at trial and, accordingly, this factor supports a conclusion that the error was harmless.

*Persuasive Value*

When conducting a harmless-error review, we also consider whether the inadmissible evidence was "highly persuasive." *Smith*, 940 N.W.2d at 505. Bigbear argues that the erroneously admitted evidence was highly persuasive because it (1) added detail and context to bolster I.M.'s credibility, (2) included impermissible character evidence, (3) introduced corroborative evidence that was not admitted at trial, (4) relayed "vouching" statements, and (5) evoked the jury's sympathy. The State counters that much of the interview was cumulative to other evidence admitted through the trial testimony of I.M., the eyewitnesses, the investigator, the other recorded interviews, and the exhibits.

We consider each of Bigbear's arguments in turn. We conclude that, on balance, this factor weighs toward concluding that the error was not harmless because Bigbear has shown that some inadmissible portions of the recorded interview were quite persuasive.

First, additional details from the erroneously admitted exhibit likely contained some persuasive value in making the circumstances of the assault more conceivable. In *State v.*

13

*Wright*, we concluded that erroneously admitted testimony impacted the verdict because it "elicited new information." 726 N.W.2d 464, 477 (Minn. 2007) (citation omitted) (internal quotation marks omitted). But in that case, the inadmissible statement included the victim's description of the weapon, the defendant's threats, and the victim's state of mind. *Id.* Here, the additional details are not as material. They include I.M.'s approximation that the sexual assault happened "like two months ago," and that before it began, she and Bigbear had been joking about sex, he grabbed her buttocks, and he told her that he wanted to have sex with her.

Bigbear compares this case to *State v. Expose*, but that case is inapposite. There, we concluded that erroneously admitted testimony about the defendant's threats was not harmless because admissible testimony about the threats was less "substantial" and "extensive," and the inadmissible testimony "provided the *key* evidence" about a material element for the charge—the defendant's mens rea. *Expose*, 872 N.W.2d at 255, 261 (emphasis added). Here, by contrast, I.M. testified to the "key" evidence at trial on the material element at issue—sexual penetration—and her testimony on that issue was consistent with Mother's and Boyfriend's eyewitness testimony and their unchallenged recorded statements with the investigator. Because there was cumulative evidence to prove sexual penetration, the recorded interview did not provide the "key" evidence on a material element of the offense.

Second, inadmissible character evidence undoubtedly had persuasive effect and was inappropriately admitted. I.M. used inflammatory language, calling Bigbear a "pedophile" and a "pervert" in her interview. This name-calling is character evidence excluded by the

14

Minnesota Rules of Evidence because of its unfairly prejudicial impact. It is difficult to imagine how Bigbear could have rebutted this inadmissible character evidence without attracting more attention to it. That the State offered this clearly inadmissible portion of the video without redaction in a case alleging sexual assault was a significant misstep. We expect prosecutors, when seeking admission of a prior consistent statement—and district courts when admitting such evidence—to be vigilant in excising unfairly prejudicial, extraneous material before it is played for the jury.

Third, the "extrinsic corroborating evidence"—I.M.'s recorded statements about Bigbear's Facebook profile and about her chlamydia diagnosis—also had persuasive effect. On the one hand, I.M.'s statement that she had found Bigbear's Facebook profile does not carry much weight because I.M., Mother, and Boyfriend all identified Bigbear as the perpetrator at trial. But conversely, I.M.'s recorded interview contained the only evidence of a chlamydia diagnosis after the sexual assault. If taken as true by the jury, her statement suggested that there is physical proof of the crime. Cross-examination of the investigator may have undercut the persuasive impact of that statement somewhat because he testified that he had not seen evidence of such a diagnosis and that no sexual assault examination of I.M. had taken place. But the investigator's testimony may have just as easily suggested that he simply had not followed up about the diagnosis, not that he had ruled out the diagnosis or found I.M. uncredible on that point. Ultimately, I.M.'s recorded

15

statement about contracting chlamydia from Bigbear was sufficiently pointed that it was likely difficult to un-ring that bell with the jury.[9]

Fourth, improper vouching typically occurs when the State "intentionally elicited vouching testimony during trial and then used it in closing argument." *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn. 1996) (holding that the trial testimony of three witnesses about who among the victim's and defendant's families believed the victim's allegations was "improper vouching"). Unlike other cases that we have decided, in which the victim did not testify at trial, here, neither the investigator nor the social worker testified at trial on behalf of an absent victim. *See Wright*, 726 N.W.2d at 477 (concerning the trial testimony of an investigating officer who relayed the on-scene statements of assault victims who did not testify at trial). Instead, the claimed "vouching" statements by the investigator (". . . I can see it's still affecting you and I don't want this to happen to you again.") and the social worker ("You know [the investigator] doesn't make judgments about kids when they tell him gross things that happened, it's just a fact.") in the recorded interview could reasonably have been understood by the jury as contemporaneous expressions of sympathy and support for 14-year-old I.M. as she tried to recount the sexual assault to strangers. Even so, given the investigator's training and experience with victims of sex crimes, jurors may have interpreted this statement of support as the investigator's belief that I.M. was

---

[9] Again, this additional, prejudicial statement that varied from the victim's trial testimony should have been redacted before the video was offered and admitted as a prior consistent statement.

16

credibly recounting the sexual assault. Although the State did not reference these statements in closing, the jury may have been influenced by them.

Fifth, we do not believe that the recorded video was highly persuasive in evoking the jury's sympathy for I.M. Had the video been properly redacted and limited to statements consistent with I.M.'s trial testimony, the jury still would have seen her appearance as a 14-year-old and her emotions and demeanor when talking about the assault. Further, the investigator described I.M.'s demeanor and her crying in his unchallenged trial testimony. In addition, the jury saw first-hand I.M.'s demeanor and reluctance to talk about sex and body parts during her trial testimony. This cumulative evidence lessens any persuasive impact. Finally, the district court instructed the jury that it "shall not permit bias, prejudice, or sympathy to affect its verdict." Because the jury is presumed to have followed that instruction, any improper evocation of the jury's sympathy for the victim was mitigated. *See State v. Fardan*, 773 N.W.2d 303, 320 (Minn. 2009).

On balance, taking these factors into consideration, some of the wrongly admitted evidence in the recorded interview had enough persuasive value to cause us to weigh this factor as supporting a finding that its admission was harmful.

*Use in Closing Argument*

We also consider whether and how the offering party used the erroneously admitted evidence in closing argument. *Smith*, 940 N.W.2d at 505. Bigbear contends that the video's prominence was exacerbated by the prosecutor's mention of it nine times during

17

closing argument and rebuttal to encourage the jury to see I.M.'s age and demeanor and to find her credible. The State argues that the prosecutor did not emphasize the recorded interview in closing.

We agree with the State. The prosecutor referenced the recorded interview in only two paragraphs of the 19-page transcript of his closing and rebuttal arguments. The statements concerned I.M.'s appearance as a 14-year-old, her tears while being interviewed, her disgust when talking about sex and body parts, and the consistency of her statements. But these are not inherently prejudicial or improper reasons for the prosecutor to reference the video. If the consistent portions of the video had been properly admitted, the jury still would have seen a younger version of I.M., her emotions and tears while being interviewed, and her disgust when talking about sex and body parts (which was consistent with, albeit more pronounced than, her trial testimony).

Further, the prosecutor made only one reference in closing to a statement in the recorded interview that was not in I.M.'s trial testimony concerning Bigbear's picture on his Facebook profile. Because Bigbear was identified by eyewitness testimony and because Boyfriend also testified in his recorded interview to seeing Bigbear's Facebook profile, the prosecutor's mention of this detail in closing argument would not have affected the verdict. Because the prosecutor referenced the recorded interview in closing argument primarily for evidence that was also introduced by other witnesses and exhibits, this factor weighs in favor of concluding that the error was harmless.

*Effectively Countered*

We may also consider whether the defendant "effectively countered the evidence." *Smith*, 940 N.W.2d at 505. Bigbear argues that he was not able to effectively counter the recorded interview because I.M. did not remember enough at trial to be effectively cross-examined. Additionally, he maintains that because the scope of I.M.'s direct examination did not include details from the video, he was unable to question her about it. The State contends that Bigbear countered the video by highlighting gaps in I.M.'s memory and maintains that it is not fatal to harmless-error analysis if "defense counsel did not [counter] well."

We agree with Bigbear that this factor weighs in favor of concluding that the error was not harmless. Although Bigbear countered the evidence from the recorded interview to some extent in his cross-examination of I.M. and the investigator, as well as in closing arguments, ultimately, we conclude Bigbear did not effectively counter the inadmissible evidence.

*Strong Evidence of Guilt*

Finally, "overwhelming evidence of guilt is a factor, often a very important one, in determining whether . . . the error has no impact on the verdict." *State v. Juarez*, 572 N.W.2d 286, 291 (Minn. 1997). "Strong evidence of guilt undermines the persuasive value of wrongly admitted evidence." *Smith*, 940 N.W.2d at 505.

Bigbear argues that the evidence against him was not strong, citing the length of jury deliberation (5 hours) for a single-issue case; the absence of physical, medical, and DNA evidence; and the lack of any incriminating statements to investigators. The State

refutes Bigbear's hypothesis about the length of jury deliberations, references the "uncommon" number of eyewitnesses in a child sexual assault case, and highlights Boyfriend's unchallenged assertion that Bigbear told him, "I deserve it. I deserve it," as Boyfriend punched him after the sexual assault.

Although harmless-error review considers the entire record, including evidence inconsistent with a guilty verdict, this factor focuses *exclusively* on evidence of guilt. The following trial evidence is overwhelming evidence of Bigbear's guilt of criminal sexual conduct: Bigbear admitted that he was in Mother's home in the summer or fall of 2019, the timeframe at issue; Bigbear admitted that he went to lay down in a bedroom when he was inebriated and passed out; Bigbear admitted that Boyfriend woke him up very angry; Bigbear admitted that he was at least 30 years old and it is uncontested that I.M. was 14 years old at the time; I.M. testified that she went into the bedroom with Bigbear and that, there, Bigbear had sex with her and his penis entered her body; Boyfriend testified that he observed that the bedroom door was closed and the light was off before he opened the door; when Boyfriend peeked in, he could tell that Bigbear was having sex with I.M. because he saw Bigbear on top of I.M. moving up and down under a blanket; Mother also testified that Bigbear was on top of I.M. moving in a back and forth motion as if having sex; Bigbear was naked and I.M. was only wearing a shirt; when Boyfriend and Mother confronted them, Bigbear immediately jumped off the victim; Boyfriend punched Bigbear, who then said, "I deserve it. I deserve it"; and two eyewitnesses, in addition to I.M., identified Bigbear as the perpetrator in 2019 and at trial 2 years later. Bigbear does not challenge the admission of any of this evidence of guilt, which reached the jury through

20

the testimony of three witnesses, including the victim, and the recorded statements of Mother and Boyfriend. Because the evidence was overwhelming against Bigbear, this "very important" factor weighs heavily in favor of finding that any error was harmless.

\*   \*   \*

In sum, after weighing the pertinent factors using the correct harmless-error standard of review and giving appropriate weight when evaluating these factors to the overwhelming evidence that shows that Bigbear sexually assaulted I.M., we conclude that Bigbear did not meet his burden of showing that there is a "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *Jaros*, 932 N.W.2d at 472 (citation omitted) (internal quotation marks omitted). Accordingly, after applying the correct standard of review, we affirm the decision of the court of appeals to affirm Bigbear's conviction.

Although we conclude that the evidentiary error regarding the video is ultimately harmless to the verdict, we do not condone the admission of the complete video interview of I.M. when portions of the video were clearly inadmissible. We expect that in the future the State and district court judges will more carefully scrutinize prejudicial evidence that is supplemental to trial testimony before it is offered and accepted into evidence as a prior consistent statement.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

21

HENNESY, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

CONCURRENCE

HUDSON, Chief Justice (concurring).

The State abdicated its role as a minister of justice by using I.M.'s video interview to improperly bolster her credibility, evoke sympathy from the jury, and undercut Bigbear's testimony with rank, inadmissible character evidence. I join Part I of the court's opinion and narrowly concur that the error here was harmless. But I write separately to underscore this court's role in protecting the integrity of judicial proceedings and enforcing the rules of evidence.

The Minnesota Rules of Evidence play a foundational role in structuring the system of justice in this state. By their very terms, they serve to "secure fairness in administration . . . and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Minn. R. Evid. 102. One way that the Rules effectuate that purpose is by keeping unreliable evidence out of court proceedings, generally excluding hearsay statements that do not fall within an enumerated exception. Minn. R. Evid. 802; *see State v. King*, 622 N.W.2d 800, 808 (Minn. 2001) ("Statements that fall within a 'firmly-rooted' hearsay exception are assumed to be reliable and are therefore admissible." (citation omitted)). Although not squarely before us,[1] the court of appeals rightly concluded that I.M.'s recorded interview was inadmissible under Rule 801(d)(1)(B) and Rule 807.

---

[1] As the court notes, "[t]he court of appeals' conclusion that the evidence was erroneously admitted is not before this court because the State did not file a conditional cross-petition for review." *See supra* at 7 n.5.

When the Rules are broken and evidence is erroneously admitted, we must carefully consider any impact on the fairness of the proceedings. To do so, we must determine whether there is a "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Jaros*, 932 N.W.2d 466, 472 (Minn. 2019) (citation omitted) (internal quotation marks omitted). Our resolution of that question must be made in view of the entire record, *id.*, and we have previously considered factors such as: (1) whether the evidence was highly persuasive, (2) the prominence and presentation of the evidence, (3) whether the evidence was used in closing argument, and (4) whether the evidence was effectively countered. *See State v. Smith*, 940 N.W.2d 497, 505 (Minn. 2020). We have also made the commonsense observation that, regardless of the weight of such factors, "[s]trong evidence of guilt undermines the persuasive value of wrongly admitted evidence." *Id.*

The erroneously admitted video interview was "highly persuasive" and afforded the State an opportunity to introduce inadmissible corroborative and character evidence, as well as improperly evoke the sympathy of the jury and bolster the victim's credibility. *See Smith*, 940 N.W.2d at 505.

First, the interview had significant persuasive value because it referenced evidence that would tend to corroborate I.M.'s testimony but which was not introduced at trial. In the video interview, I.M indicated that Bigbear had infected her with chlamydia. This statement was plainly inadmissible hearsay that conveyed damaging evidence not established by any other evidence in the record. Compounding the damage was the obvious risk that the video's discussion of the chlamydia infection implied the existence of extrinsic

professional medical evidence to substantiate the diagnosis. Yet at trial the State introduced no such evidence of a chlamydia diagnosis or treatment.

Second, the video included inadmissible character evidence in which the victim referred to Bigbear as a "pedophile" and a "pervert." This type of inflammatory language is clearly prohibited by the Minnesota Rules of Evidence and demonstrates the State's inexplicable failure to redact the video interview to ensure that Bigbear received a fair trial. The persuasive value of this adverse character evidence is particularly pronounced in light of juror sentiments about the nature of the offense that surfaced during voir dire.[2]

Third, the video improperly evoked the sympathy of the jury by depicting an understandably tearful 14-year-old I.M., pleading for her grandmother. In closing, the State argued that I.M.'s emotions were "significant to the State's case" and noted that I.M. struggled to recount what happened in the video interview, calling it "gross" and covering her face before "the tears came." The State made the calculated choice to present the emotional video interview and reference it in closing arguments, rather than focus on I.M.'s more mature demeanor as a 16-year-old at trial. The State's reliance on the erroneously admitted video interview to evoke the jury's sympathy was improper and contributes to the

---

[2]    During voir dire, multiple seated jurors expressed revulsion upon learning the nature of the crime. For example, one juror stated that the charge made her "nauseous" and that she had an "emotional" and "physical, visceral" reaction to it; another explained that when she first learned the nature of the case, she thought that "the case was creepy."

persuasive value of the evidence, particularly because the jury was predisposed to feel sympathy for I.M.[3]

Fourth, the video had considerable persuasive value for the additional detail and context it provided the jury. *See State v. Wright*, 726 N.W.2d 464, 477 (Minn. 2007) (evidence had substantial persuasive value where it "elicited new information" (citation omitted) (internal quotation marks omitted)). For example, I.M. did not testify at trial that she and Bigbear had spoken before the assault and did not describe the assault itself with any detail. The video interview, however, neatly filled those gaps in the State's case because I.M. gave a comprehensive account of her experience with Bigbear. She discussed how, before the assault, Bigbear joked with her about sex and told her that he wanted to have sex with her, and she gave detailed descriptions of what clothes they were wearing, how clothing was removed, and how long the assault lasted. These details provided vivid, persuasive context that was notably absent from the State's presentation of trial testimony. Most concerningly, the State relied on the inadmissible video interview for the express purpose of bolstering I.M.'s credibility, and in ruling to admit it, the district court explained that the video interview helped "fill in some gaps" from her memory at trial. The persuasive value of the video interview was enhanced by the State's specific argument in closing that I.M.'s statements in the video interview corroborated her trial testimony and showed that her testimony was credible.

---

[3] Seated jurors also expressed a predisposition to feel sympathy for I.M. in their juror questionnaires. One juror said that when she learned of the charges, her initial reaction was to "feel for the child that this happened to" and another juror's initial reaction was that "it's very sad to hear that this happened."

I do not agree with the court's reasoning that because the additional details did not go to material elements of the crime, they were less persuasive. As the State explained when arguing for admission of the video interview, I.M.'s initial outline of the crime to law enforcement *is* evidence of a material fact. Further, the additional details in the video provided specific, compelling reasons for the jury to credit the victim's account of the assault, which is precisely what the State encouraged the jury to do. Here, as in many sexual assault prosecutions, witness credibility strikes at the very heart of the case and has undeniable persuasive value. By discounting the value of details that bolster witness credibility simply because they do not bear on the "material elements" of the charged offense, the court trivializes the persuasive value of this critical evidence.

Because the video interview introduced inadmissible corroborative and character evidence, and improperly evoked the jury's sympathies to bolster I.M.'s credibility, the erroneously admitted evidence was "highly persuasive" and this factor weighs toward concluding that the error was not harmless.

Not only was the erroneously admitted video evidence highly persuasive, it was also unmistakably prominent. *See Smith*, 940 N.W.2d at 505–06. We have previously analyzed the prominence of erroneously admitted evidence by measuring the relative number of transcript pages that the challenged evidence occupies. *See id.* at 506. Although I agree with the court as to which portions of the video were inadmissible, we reach different conclusions regarding whether the relative number of transcript pages those statements occupy weighs towards concluding the error was or was not harmless. Here, I.M.'s erroneously admitted interview spanned 33 trial transcript pages, and the inadmissible

statements therein span a greater portion of the trial transcript than the whole of her trial testimony on direct examination. Indeed, when compared to I.M.'s *entire* trial testimony, the inadmissible statements are two-thirds the length of her entire trial testimony. The prominence of the erroneously admitted video weighs toward concluding that the error was not harmless.

Additionally, the prominence of the inadmissible video evidence was compounded by the State drawing upon it in closing argument. *See Smith*, 940 N.W.2d at 505. On this point, the court's analysis misapprehends the prejudicial effect of the State's numerous references to the erroneously admitted evidence during closing argument. The State impermissibly pointed to the video *three times* to show consistency between I.M.'s video statement and her trial testimony, thereby establishing I.M.'s credibility and suggesting that the State had met its burden on each element. In this case of competing narratives, credibility was essential to discerning the truth, and the State's repeated references to the erroneously admitted video interview and inadmissible statements during closing argument reinforced I.M.'s credibility with the jury. This factor weighs towards concluding that the error was not harmless.

Furthermore, as the court correctly recognizes, Bigbear was not able to "effectively counter[] the evidence." *Smith*, 940 N.W.2d at 505. This factor underscores the gravity of the erroneous admission of the video evidence in this case. Because the prosecutor did not ask I.M. about certain inadmissible statements from the video, such as her contraction of chlamydia or reference to Bigbear as a "pedophile," and because the video interview was not broadcast to the jury until after I.M. testified, Bigbear had no opportunity to cross-

examine I.M. about the inconsistent statements and additional information contained therein without recalling her to testify. Whether the district court would have permitted Bigbear to recall the minor victim and question her about the inconsistencies is unknown, but it is clear that the State's decision to present the complete video interview without proper redaction left Bigbear with a Hobson's choice: forego cross-examination or recall the State's key witness. In fact, Bigbear's only real opportunity to counter the evidence was in cross-examination of the investigator (who admitted there was no evidence of the chlamydia diagnosis) and during closing argument. This was insufficient for Bigbear to effectively counter the erroneously admitted evidence. Accordingly, this factor weighs towards concluding that the error was not harmless.

Although I find that all of the foregoing *Smith* factors suggest that the district court's error in admitting the video statement was not harmless, I must lastly consider whether there was overwhelming evidence of guilt to support the jury's verdict. *See State v. Juarez*, 572 N.W.2d 286, 291 (Minn. 1997). Here, I agree with the court that the cumulative weight of unchallenged evidence of Bigbear's guilt is strong. In addition, this sexual assault case presents the rare instance in which the State presented eyewitness testimony of not one, but two individuals who—aside from the victim—directly observed the crime. Both eyewitnesses were interviewed by the investigator and recordings of their interviews were admitted at trial; much of those interviews was consistent with their trial testimony two years later. Considering the eyewitness testimony, I see no reasonable possibility that the erroneous admission of I.M.'s video interview substantially affected the jury's verdict. I thus agree with the court that the error was harmless.

But we must remember that justice is a process, not a result. And the process here should concern us all because it undermined the public's trust and confidence in the judicial system. Bigbear's ability to defend himself was undoubtedly hindered by the admission of the complete, improperly redacted video interview, and the district court erred in admitting it. And, more to the point, in my view, the State abused its prosecutorial power by introducing the full 33-minute video. Prosecutors are called to be ministers of justice, and as such, they should not seek convictions at all costs. *State v. Ramey*, 721 N.W.2d 294, 300 (Minn. 2006) ("Prosecutors have an affirmative obligation to ensure that a defendant receives a fair trial, no matter how strong the evidence of guilt.").

THISSEN, Justice (concurring).

I join Part I of the majority opinion and in the concurrence of Chief Justice Hudson.